1  SNYDER ♦ DORENFELD, LLP
   David K. Dorenfeld, (State Bar No. 145056)
2  Michael W. Brown, (State Bar No. 205380)
   5010 Chesebro Road
3  Agoura Hills, CA 91301
   Telephone:  (818) 865-4000
4  Facsimile:  (818) 865-4010
   Email: davidd@sd4law.com
5         mwb@sd4law.com

6  CATHY JACKSON LERMAN, PA
   Cathy J. Lerman
7  7857 W. Sample Rd., Suite 140
   Coral Springs, FL 33065
8  Telephone: (954) 663-5818
   Facsimile: (954) 341-3568
9  Email: clerman@lermanfirm.com

10 BURSOR & FISHER, P.A.
   L. Timothy Fisher (State Bar No. 191626)
11 1990 North California Blvd., Suite 940
   Walnut Creek, CA 94596
12 Telephone: (925) 300-4455
   Facsimile:  (925) 407-2700
13 Email: ltfisher@bursor.com

14 Attorneys for Plaintiffs

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17 STANLEY LEVINE, CHARLES BRISSETTE,      )  Case No.: C12-3959
   SANDRA BRISSETTE, ANITA DORIO, ANITA    )
18 DORIO as Trustee of the Virginia M. Wallace )  CLASS ACTION COMPLAINT
   (deceased) IRA, Inheritance Trust, and Kyle V. )
19 Wallace (deceased) Decedent's Trust; GARY   )  JURY TRIAL DEMANDED
   DORIO, ELIAS ZACHOS, GERALD WATTS,       )
20 individually, and on behalf of a class of similarly )
   situated persons,                        )
21                                          )
                                            )
22            Plaintiffs,                    )
   v.                                       )
23                                          )
   THE ENTRUST GROUP, INC., ENTRUST         )
24 ADMINISTRATION, INC., ENTRUST NEW        )
   DIRECTION IRA, INC. n/k/a NEW DIRECTION  )
25 IRA,  INC., ENTRUST ARIZONA, LLC n/k/a   )
   VANTAGE RETIREMENT PLANS, LLC, and       )
26 EQUITY TRUST COMPANY,                    )
                                            )
27            Defendants.                    )
                                            )
28

CLASS ACTION COMPLAINT

# I. INTRODUCTION

1.     This is a class action lawsuit against The Entrust Group, Inc., Entrust Administration, Inc., Entrust New Direction IRA, Inc., Vantage Retirement Plans, LLC and Equity Trust Company (the "Custodians" or "Defendants") for making false and misleading representations that the investments made by Plaintiffs and the Class Members were safe, profitable and legitimate when in fact the money invested by Plaintiffs and the Class Members was being stolen by the individuals who urged them to invest.

2.     Plaintiffs and the Class Members invested their money into Self-Directed Investment Retirement Account ("SDIRAs").  A SDIRA is an individual retirement account ("IRA") held by a trustee or custodian that permits investment in a broader set of assets than is permitted by most IRA custodians.  It is estimated that approximately $94 billion was held in SDIRAs in the United States in 2011.

3.     Plaintiffs and the Class Members were convinced to invest in the SDIRAs by Fraud Promoters, a term used by the SEC to describe individuals who devise and orchestrate Ponzi schemes to defraud innocent investors. The Fraud Promoters insisted that Plaintiffs and the Class Members invest in SDIRAs administered by specific Custodians.  The use of established companies like the Custodians provided a sense of legitimacy to an otherwise fraudulent investment scheme and helped entice inexperienced investors to invest their money into the Fraud Promoters' fraudulent investments.  The Fraud Promoters frequently emphasized the size and experience of the Custodians as evidence of their credibility as investment advisers.

4.     The Fraud Promoters invested the money deposited by Plaintiffs and the Class Members in their SDIRAs in "investments" that were fraudulent, illusory or non-existent.  The Custodians aided and abetted the fraud by periodically sending out investment account statements showing extraordinary investment returns in the SDIRAs when in fact the Fraud Promoters were absconding with the victims' money.

5.     The Custodians were also obligated to report annually the fair market value of the SDIRAs.  The Custodians, however, failed to ascertain the actual value of the SDIRAs owned by Plaintiffs and the Class Members.  Instead, they reported the same value each year unless the Fraud

SNYDER ♦ DORENFELD, LLP

Promoters provided a greater value to the Custodian in which case the Custodian reported the increased value to the victim.

6.     The Custodians knew that the Fraud Promoters were defaulting on loans, notes and other "investments" included in the SDIRAs.  Nevertheless, they failed to disclose that the Fraud Promoters were stealing the money invested by Plaintiffs and the Class Members.  Many of the victims lost their entire life savings.

## II.  JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 (d) (2) and the Class Action Fairness Act.  Plaintiffs and certain Defendants are citizens of different states.  The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendants pursuant to, *e.g.*, 18 U.S.C. § 1965, the Due Process Clause of the U.S. Constitution, and the Code of Civil Procedure § 410.10.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims arising under California state law for violation of California's Unfair Competition law (Business and Professions Code § 17200, *et seq.*).

9.     Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Defendants and Class Members reside in this jurisdiction.

10.     Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service while soliciting consumers within the definition of the California's Unfair Competition Law.

## III.  THE PARTIES

11.     Plaintiff Stanley Levine ("Levine") is 85 years old and a resident of Newport Beach, California.  In 2008, Levine invested approximately $150,000 in a fraudulent enterprise resulting in a total loss of his investment.

12.     Plaintiff Charles Brissette is a resident of Glendale, California.  In or about July of 2006, Mr. Brissette invested approximately $23,000 through an Entrust SDIRA in a fraudulent enterprise resulting in a total loss of his investment.

13.     Plaintiff Sandra Brissette is a resident of Glendale, California.  In or about July of

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT

2006, Mrs. Brissette invested approximately $61,000 through an Entrust SDIRA in a fraudulent enterprise resulting in a total loss of her investment. At all times material hereto, Charles Brissette and Sandra Brissette were husband and wife.

14.     Plaintiffs Anita Dorio, Gary Dorio, and Anita Dorio as Trustee of the Virginia M. Wallace (deceased) IRA Inheritance Trust, and Kyle V. Wallace (deceased) Decedent's Trust (collectively "Dorios") are residents of League City, Texas.  In or about March of 2009, the Dorios invested approximately $1,300,000 through an Equity Trust SDIRA in a fraudulent enterprise, resulting in total loss of their investment.  At all times material hereto, the Dorios were husband and wife.

15.     Plaintiff  Elias Zachos ("Zachos") is a resident of Austin, Texas and is 76 years old. Zachos invested $159,000 through an Equity Trust SDIRA in a fraudulent enterprise resulting in total loss of his investment.

16.     Plaintiff Gerald Watts is a resident of Bandera, Texas and is 70 years of age.  Watts invested $18,227 through an Equity Trust SDIRA in a fraudulent enterprise resulting in a total loss of his investment.

17.     Defendant Equity Trust Corporation ("Equity Trust") is a trust company organized under the laws of the state of South Dakota with its principal place of business in Elyria, Ohio. Equity Trust bills itself as "the nation's leading provider of self-directed IRAs and 401ks, with over 128,000 clients in all 50 states and close to $10 billion dollars of retirement plan assets under administration."

18.     The Entrust Group is a Delaware ("Entrust Group") corporation with its principal place of business in Oakland, California.  Entrust Group touts itself as the "world's premier provider of account administration services for self directed IRAs" and "the only self-directed IRA administrator that serves you right in your community."  Entrust Group, until December of 2011, had a national network of affiliated companies which were franchisees of the Entrust Group.

19.     Entrust Administration, Inc. ("Entrust Admin") is a California corporation with its principal place of business in Los Angeles, California.

SNYDER ♦ DORENFELD, LLP

20.    Defendant Entrust Arizona, LLC n/k/a Vantage Retirement Plans, LLC ("Entrust Arizona") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

21.    Defendant Entrust New Direction IRA, Inc. n/k/a New Direction IRA, Inc. ("Entrust Colorado") is a Colorado corporation with its principal place of business in Denver, Colorado.

22.    At all times material hereto, Entrust Colorado was a franchisee of Defendant Entrust Group until December of 2011.

23.    At all times material hereto, Defendant Entrust Admin was a wholly-owned subsidiary of Defendant Entrust Group.

24.    Entrust Group, Entrust Admin, Entrust Colorado and Entrust Arizona will be referred to collectively herein as "Entrust."

25.    Certain other individuals and entities who were involved in the fraudulent enterprises that damaged Plaintiffs and the Class Members are not sued because they are either under criminal investigation or already in prison, their assets are being pursued by a trustee/receiver, or further collection efforts would be fruitless.

## IV.    FACTUAL ALLEGATIONS

### A.    SDIRAs and the Role of the Custodians

26.    Investors in SDIRAs are permitted to invest in a variety of nontraditional investment options of their own choosing, including tax lien certificates, promissory notes, real estate, businesses, and LLCs.  Traditionally, few large investment companies or banks will administer SDIRAs because of their complexity.

27.    SDIRAs are administered by custodians or trustees.  A stark contrast exists, however, between the "administration" performed by trustees and custodians of SDIRAs, as compared to the "administration and management" performed by the trustees and custodians of traditional IRAs.

28.    The trustees and custodians of traditional IRAs are considered fiduciaries of the IRA account such that the trustees and custodians are responsible for maintaining and managing the

SNYDER ♦ DORENFELD, LLP

1    securities in the IRA account, keeping track of distributions and dividend income, and making sure

2    everything is done legally and correctly.

3         29.    Custodians of SDIRAs, however, deny any type of fiduciary responsibilities even

4    though they receive significant fees that are based upon a percentage of the purported value of the

5    SDIRA for administering an SDIRA.  In fact, the Custodians employ complex non-negotiable form

6    contracts that seek to significantly limit their liability to their customers including Plaintiffs and the

7    Class Members.

8         30.    Equity Trust and Entrust have made hundreds of millions of dollars while claiming

9    to "administer" SDIRAs that have resulted in many of their customers losing their entire life

10   savings (which were invested in SDIRA "investments" that were illegal, illusory, non-existent, or

11   failing).

12       **B.**    **The Custodians Targeted Inexperienced Investors**

13        31.    The Custodians maintained company websites and engaged in extensive email

14   marketing campaigns that targeted inexperienced investors with retirement savings accounts,

15   including 401ks and Roth IRAs, and provided investment advice and information about SDIRAs.

16        32.    To enhance the appearance of legitimacy of their services, the Custodians sponsored

17   Webinars about the safety, efficiency and profitability of investing in SDIRAs.

18        33.    In fact, Equity Trust sponsored Webinars about investing in its SDIRAs featuring

19   IRS agents as spokespersons.  Such marketing ploys were intended to lead consumers to believe

20   that the Custodians' services were validated and approved by the IRS.

21        34.    "IRS Approved" sales pitches are well known in investment circles and among

22   securities regulators for being a frequently utilized method of investment advertising and marketing

23   solicitation, designed to solicit consumers seeking IRA custodial services.

24        35.    The Custodians and Fraud Promoters encouraged Plaintiffs and the Class Members

25   to utilize Limited Liability Companies ("LLC") to hold their SDIRA investments.

26        36.    Most state consumer protection laws require investment promoters to disclose in

27   writing all relevant facts about both themselves and the offered investment.  However, it is

28   common knowledge among securities regulators that individuals promoting fraudulent investments

CLASS ACTION COMPLAINT               5

SNYDER ♦ DORENFELD, LLP

1   favor LLCs or partnerships to hold investments to evade the consumer protection requirements of

2   state and federal securities law.

3       37.    If a person intent on committing fraud utilizes an LLC then they can hide personal

4   bankruptcies and previous securities violations as well as avoid written disclosure of the

5   investment risks, actual marketing costs, and their investment experience.

6       **C.    The Investments Made by Plaintiffs and the Class**

7       38.    Plaintiffs and the Class Members invested in SDIRAs at the urging of the Fraud

8   Promoters.  Indeed, the Fraud Promoters could not have obtained the monies in the retirement

9   accounts of the Plaintiffs and the Class Members without using a SDIRA since that is the only

10  investment vehicle that permits unregulated, non-traditional investments.  The Fraud Promoters,

11  upon belief and information, included Ephren Taylor, Robert Stinson, Jr., Aaron W. Duncan,

12  Advanced Technology Marketing LLC, Douglas Vaughn,  Kurt Barton, Randell Morrison, Steven

13  Edward Gwin, Jerry A. Smith, Jason M. Snelling,  Al Parrish, Richard A. Daniels, Casey Charles,

14  William Wise, Christian Stanley, Trevor Cook, Gibraltar Partners Inc., Oxford Global Advisors,

15  International Bank and Trust, Chris Cornett, Andrew Zagorski, Glenn Allen Britt, Mauro E.

16  Lobato, Jr., Mark David Shiner, Leon Swichkow, Timothy Wetherald, Jerome "Jerry" Malcolm

17  and Cal-Terra Partners, LLC, Brian B. Smith, Sean Weylen, Nate Heaps, John Day, Kevin Brown,

18  John Bravata, Patrick Merrill Brody, Laura Roser, MF Global, Gregory Fitzpatrick, Westmoore

19  Management, LLC, Westmoore Investment, L.P., Westmoore Capital Management, Inc.,

20  Westmoore Capital, LLC, (collectively "Westmoore") and Matthew Jennings, CEO of Westmoore,

21  and Joseph Gennaco.

22      39.    The Fraud Promoters were not legitimate investment advisers but instead sought to

23  defraud Plaintiffs and the Class Members.  Many of the Fraud Promoters have either gone into

24  hiding, are awaiting trial or are serving prison sentences for their crimes.

25      40.    The Fraud Promoters mandated that Plaintiffs and the Class Members invest in

26  SDIRAs administered by the Custodians.  The Fraud Promoters were acutely aware that their

27  affiliation with and use of the Custodians provided a sense of legitimacy to an otherwise fraudulent

28  investment scheme and enticed inexperienced investors, who might otherwise be more cautious,

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1    into an investment scam because they believed they were protected by large, purportedly well-

2    funded companies with trustworthy names like "Equity Trust" and "Entrust."

3    41.    The Fraud Promoters placed the Custodians' names in marketing documents and/or

4    e-mail solicitations to Plaintiffs and the Class Members detailing that the selected custodian was

5    the only custodian that managed the SDIRAs for the particular Promoter.

6    42.    In some marketing documents used by the Fraud Promoters, a specific employee or

7    agent of the Custodians was identified as the contact for the investor to make sure that the

8    "investment story" being told remained consistent.

9    43.    To "sell" their victims, the Fraud Promoters frequently emphasized the size and

10    experience of the Custodians as further evidence of the Fraud Promoters' strength and credibility as

11    a successful investment adviser. The Fraud Promoters also told their intended victims that they had

12    been "approved" by the Custodians thus further enhancing the credibility of the Fraud Promoter

13    with their targets.

14    44.    The Fraud Promoters also knew that the SDIRAs of Plaintiffs and the Class

15    Members were set up to automatically renew or "rollover" each year such that Plaintiffs and the

16    Class Members could not liquidate their investments automatically at the end of the investment

17    period and, in fact, were not even notified at the end of any investment period that they could

18    withdraw their investment funds or "choose" to reinvest.

19    **Plaintiff Stanley Levine**

20    45.    Plaintiff Stanley Levine first became aware of a potential investment opportunity

21    with Fraud Promoter Matthew Jennings in 2008 through a client of Levine's accountant who

22    worked for Jennings.

23    46.    Levine met Jennings, the principal of Westmoore, and Jennings explained to Levine

24    that Westmoore had several subsidiary companies that provided a diverse range of investment

25    opportunities including property development, venture capital backing for high growth start-up

26    companies desiring to go public, and business management companies. Jennings told Levine that

27    the Westmoore investors were receiving 17-18% return on investment.

28

47.    To make the investment, Levine transferred $150,000 from an IRA that Levine had with Charles Schwab ("Schwab") into a SDIRA with Entrust.

48.    Levine learned about Entrust from Jennings. Jennings had recommended Entrust to Levine and explained how Levine could invest in Westmoore by creating a SDIRA with Entrust. Levine had a feeling that Jennings knew the people at Entrust personally.

49.    Levine thought that the documents he had to sign to open his Entrust SDIRA were long and complicated.   Levine did not understand them.   Levine also thought the SDIRA investment process was too complex and confusing, but Levine trusted Jennings so he signed the SDIRA documents to open an account with Entrust and made the investment with Westmoore.

50.    Jennings specifically assured Levine that Entrust "accepted Jennings' investments for his other clients as a SDIRA custodian and they will do the same for you.  You will have no problems with them."

51.    Based upon these assurances, Levine made his first investment of $150,000 with Jennings and his Westmoore entities through an Entrust SDIRA.

52.    Levine began receiving SDIRA Account Statements from Entrust in 2008.  These Account Statements reflected Levine's Westmoore investment of $150,000 as simply a "Not Categorized" investment.

53.    Levine's Entrust SDIRA Account Statements from 2008 until 2011 never specified what assets Levine's Entrust SDIRA held pursuant to his first Westmoore investment through Entrust.   In fact, each one of Levine's Entrust SDIRA Account Statements from 2008-2011 reflected a SDIRA account value of $150,001.23.

54.    Levine's Entrust SDIRA Account Statement for calendar year 2009 stated that in May of 2009 Entrust, for the benefit of Levine's SDIRA and without Levine's knowledge or consent, had sold the Westmoore asset originally purchased from Westmoore Capital Group and purchased an asset from Westmoore Investment LP. However, Levine's SDIRA statement did not reflect exactly what asset Entrust had purchased on Levine's behalf or what Levine's SDIRA held as security for the investment, if anything.

SNYDER ♦ DORENFELD, LLP

55.     Levine's Entrust SDIRA statement for the first quarter of 2009 advised Levine that Entrust "in an effort to add an additional layer of security for our clients, we are changing how funds credited to your IRA are made payable." But the statement directed Levine to visit the Entrust website to access the information.

56.     In 2010, Entrust started sending out disclosures on its SDIRA account statements and letters to its customers, including Levine, explaining certain regulatory requirements applicable to the Custodian's ownership of SDIRA assets. Levine received the disclosure on his Entrust SDIRA Account Statement for the second quarter of 2010 and received the letter in May of 2010.

57.     Entrust, by the second quarter of 2010, had known for several years that its SDIRAs were being utilized by Fraud Promoters to perpetuate investment fraud on Entrust customers.

58.     Instead of disclosing these facts to its customers and addressing the problem, Entrust chose to divert attention from its own responsibilities and instead advised Levine, and its other clients, that regulators were becoming more stringent about the requirement that SDIRA assets must be held with the designated custodian as opposed to a mere nominee like Entrust.

59.     In addition, Entrust indicated that regulators were now requiring the custodians to ascertain fair market value of the SDIRA account and to review the "nature" of the assets that were not publicly traded assets such as stock.

60.     Entrust stated in this disclosure that it was exploring changes to its business model and exploring business relationships to bring it into compliance with these regulations. Entrust also advised in its second quarter 2010 statement to Levine and its other customers that it was raising its administrative fees.

61.     Sometime in January of 2011, Levine found out that the SEC was investigating Jennings and Westmoore and, in fact, the SEC had indicated that Jennings was running a Ponzi Scheme through Westmoore. About this same time, Levine received a letter from Jennings indicating that Levine would not be receiving any more investment interest payments from any of his Westmoore investments.

62.     Thereafter, Levine received a letter advising him that the SEC was shutting down all of the Westmoore entities and that the Westmoore entities were being forced into receivership.

SNYDER ♦ DORENFELD, LLP

63.     The Levines attended a court hearing about the Westmoore receivership and the distribution of Westmoore assets.   Levine inquired as to what he might receive from the receivership but was told that it was unlikely Levine would receive anything from his Westmoore investment.

64.     Subsequently the SEC announced that Jennings had raised money from investors through more than 15 offerings of debt and equity that were not registered with the SEC under securities laws and that Jennings had operated a corporate shell game/Ponzi Scheme through Westmoore.

65.     After Westmoore's collapse, Levine wanted to close his Entrust SDIRA.   But Levine learned that Entrust wanted $750 to close Levine's SDIRA.

66.     Levine kept trying to get Entrust to reduce the value of his SDIRA to zero since the Entrust custodial fees were based on a percentage of the value of the SDIRA but a representative of Entrust told Levine he would have to get someone at Westmoore to provide Entrust with a written third party SDIRA valuation form that Levine's SDIRA had zero value.   But Levine could not get anyone at Westmoore to complete the third party SDIRA valuation form for him.

67.     Then in late 2011, Levine received another letter from Entrust concerning the 2011 Fair Market Valuation of his SDIRA.   In this letter, Entrust advised Levine that First Trust Company of Onaga served as the Custodian for Levine's Entrust SDIRA and that First Trust as the SDIRA Custodian was "required to obtain the most current fair market value available for the investment(s) in the IRA at least once a year" and that the valuation should be performed by a "qualified, independent third party."

68.     Enclosed with the Fair Market Valuation letter from Entrust was an Entrust "Annual Fair Market Valuation" form.   Levine could not get anyone at Westmoore to complete the valuation so Levine completed the form and submitted it to Entrust.

69.     In April of 2012, Levine received a letter from Entrust advising Levine that he owed Entrust $323.77 in outstanding fees and that Entrust was going to close his SDIRA if Levine did not pay the outstanding fees.

SNYDER ♦ DORENFELD, LLP

70.     Then in June of 2012, Levine received an IRS Form 5498 document from Entrust indicating that Entrust had reported to the IRS that Levine's SDIRA was valued at $1.23. Levine had no idea why Entrust issued that statement or why his SDIRA value was suddenly reduced by Entrust.

71.     To this day, Levine does not know what happened to his Entrust SDIRA assets. In June of 2010, the SEC obtained an emergency court order freezing all assets controlled by Jennings and the Westmoore entities and confirmed that Jennings had been operating a $53 million Ponzi scheme through the Westmoore entities.

72.     Levine, as a senior, had certain needs and requirements related to his investments. Entrust marketed itself and represented itself to Mr. Levine and other seniors that: (a) it had experience with seniors and their special needs; (b) that it provided a safe and secure method of investment for seniors; and (c) that it could and would meet those special needs.

73.     Levine's SDIRA statements from Entrust failed to accurately reflect the fair market value of his SDIRA assets. Entrust also failed to disclose that Levine's SDIRA assets had been stolen by Jennings and become worthless. Entrust also did not ascertain the actual value of the SDIRA assets owned by Levine and failed to report the actual value of their SDIRAs to the IRS as required by law.

**Plaintiffs Charles and Sandra Brissette**

74.     Plaintiffs Charles and Sandra Brissette first became aware of a potential investment opportunity with Fraud Promoter Ephren Taylor ("Taylor") in 2005 when they received a flyer advertising an investment seminar Taylor had scheduled in the Los Angeles, California area. Taylor was touting investment returns of 15%.

75.     Mr. and Mrs. Brissette eventually decided to invest with Taylor and were directed by Taylor and his staff to open a SDIRA with Entrust to invest in Taylor's ventures.

76.     Mr. Brissette invested $23,000 in Taylor's property investment ventures, while Mrs. Brissette invested $60,000 in the same property investment ventures. Taylor allegedly owned and was developing the James A Reed Condo Development, the Jazz District Residential Home Development, and the Peregrine Falcon - City of KCKS: 400 Home Development properties. As

SNYDER ♦ DORENFELD, LLP

consideration for their investments, Mr. and Mrs. Brissette were to receive 15% interest on their investments.

77.    Mr. and Mrs. Brissette each received a promissory note from Ephren Capital Corporation, one of the Taylor-controlled investment companies, in July of 2006 to secure their investments.

78.    However, Taylor started defaulting on the interest payments due on the Brissettes' promissory notes in early 2007.

79.    Mr. and Mrs. Brissette were never notified by Entrust that their promissory notes with Taylor were in default nor was it reflected on their Entrust SDIRA account statements.

80.    Mr. and Mrs. Brissette were also never notified by Entrust that the interest payments on their promissory notes were not being received from Taylor.

81.    A lawyer for Taylor, Donald Maxwell, contacted Mr. and Mrs. Brissette in 2008 and provided them with amended promissory notes and assurances that the amended promissory notes would be repaid.

82.    Taylor made two interest payments on the promissory notes in 2008 and has never made another payment to the Brissettes.

83.    Entrust also continued to bill Mr. and Mrs. Brissette year after year based upon the stated value of their SDIRA accounts even though Taylor had absconded with their investment monies in 2006.

84.    In 2010, Entrust started sending out disclosures on its SDIRA account statements concerning regulatory requirements applicable to the Custodian's ownership of SDIRA assets.  Mr. and Mrs. Brissette received such a statement from Entrust for the second quarter of 2010.

85.    Entrust, by the second quarter of 2010, had known for several years that its SDIRAs were being utilized by Fraud Promoters to perpetuate investment fraud on Entrust customers.

86.    Instead of disclosing these facts to its customers and addressing the problem, Entrust chose to divert attention from its own responsibilities and instead advised Mr. and Mrs. Brissette, and its other clients, that regulators were becoming more stringent about the requirement

SNYDER ◆ DORENFELD, LLP

1    that SDIRA assets must be held with the designated custodian as opposed to a mere nominee like

2    Entrust.

3      87.    In addition, Entrust indicated that regulators were now requiring the custodians to

4    ascertain the fair market value of the SDIRA account and review the "nature" of the assets that

5    were not publicly traded assets such as stock.

6      88.    Entrust stated in this disclosure that it was exploring changes to its business model

7    and exploring business relationships to bring it into compliance with these regulations.

8      89.    Entrust also advised in its second quarter 2010 statement to the Brissettes and its

9    other customers that it was raising its administrative fees.

10      90.    To this day, Mr. and Mrs. Brissette have never found out what happened to their

11   SDIRA assets that were held by Entrust. Taylor is now a fugitive and has been accused by the SEC

12   and other state securities regulators of running a multi-million dollar Ponzi scheme.

13      91.    Yet the Brissettes' Entrust statements year after year continued to reflect that their

14   SDIRAs were valued at a little over $26,000 and $60,000 respectively and never indicated that the

15   2008 amended promissory notes given to them by Taylor had expired and that the prior 2006

16   promissory notes had been in default since 2007.

17      92.    The Brissettes' SDIRA statements from Entrust failed to accurately reflect the fair

18   market value of their SDIRA assets. Entrust also failed to disclose that their SDIRA assets had

19   been stolen by Taylor and become worthless and that the purported security for their SDIRA assets

20   was in default and no longer viable. Entrust also did not ascertain the actual value of the SDIRA

21   assets owned by the Brissettes and failed to report the actual value of their SDIRAs to the IRS as

22   required by law.

23   **Plaintiffs Anita and Gary Dorio**

24      93.    Plaintiff Anita Dorio's father worked and saved more than 30 years to provide his

25   family, including his wife and three children, with a trust fund that would assure their well-being

26   after he died. When Anita Dorio's mother became incapacitated, per the trust agreement, Anita

27   Dorio became the trustee.

28

SNYDER ♦ DORENFELD, LLP

94.     Anita and Gary Dorio are devout Christians who are studying to be ministers.  The Dorios wanted to use their family trust funds to get the maximum benefit for the beneficiaries as well as to try to benefit others and their community.

95.     In November of 2008, the Dorios were introduced to Ephren Taylor when he spoke at their church about investment opportunities through another of his publicly-traded companies, City Capital Corporation ("City Capital").  The Dorios decided to invest with Taylor because he promised to benefit the less fortunate, help poor communities and also benefit Christians across the country.  Taylor told the Dorios that his father was the minister of a Church of Christ and that Taylor was also an ordained minister.

96.     To invest with Taylor, the Dorios were directed by Taylor to open a SDIRA with Equity Trust.  In early 2009, the Dorios moved their inheritance of $1.3 million to an Equity Trust SDIRA.

97.     Taylor told the Dorios that Equity Trust was the only SDIRA Custodian he used for his investments and that Equity Trust was the best and largest SDIRA Custodian.  The Dorios felt more comfortable investing with Taylor once they learned he was affiliated with Equity Trust, which they believed to be a large, well respected company.

98.     The Dorios started receiving monthly distributions from their SDIRA.  Then, in September of 2010, the Dorios' monthly distribution stopped and Taylor abruptly resigned as CEO of City Capital.

99.     The Dorios eventually learned that the Taylor "investments" purchased through their SDIRA were either nonexistent or worth about 10% of their value.

100.    Without any funds to assist them, the Dorios were left to care for Anita Dorio's 76-year old mother who was on a feeding tube and required around the clock care.  Neither Gary nor Anita could ever leave their home at the same time unless they were fortunate enough to find a relative who could take care of Anita's mother.  They took turns sleeping, eating and running errands and taking care of Anita's mother.

101.    When the Dorios found out that their trust funds were gone, they contacted Equity Trust for assistance to determine what had happened to the assets in their SDIRA.

CLASS ACTION COMPLAINT                                                                                      14

102.   However, Equity Trust refused to assist the Dorios in finding out what happened to their SDIRA assets and would not answer any questions about where Equity Trust had wired their money or what the SDIRA funds had been used for.

103.   Eventually Equity Trust gave the Dorios an ultimatum - either the Dorios had to pay all of the outstanding fees that Equity Trust claimed were owed based upon the stated value of their SDIRA as reported by Equity Trust or Equity Trust was going to report the original value of the Dorios' SDIRA to the IRS as a distribution to them and the Dorios would have to pay taxes on the full amount of their original SDIRA investment that had been stolen.

104.   To this day, the Dorios have never learned what happened to their $1.3 million SDIRA assets.   Taylor has been accused by the SEC of running a multi-million dollar Ponzi scheme and is now a fugitive.

105.   The Dorios' SDIRA statements from Equity Trust failed to accurately reflect the fair market value of their SDIRA assets.  Equity Trust also failed to disclose that their SDIRA assets had been stolen by Taylor and become worthless and that the purported security for their SDIRA assets was in default and no longer viable.  Equity Trust also did not ascertain the actual value of the SDIRA assets owned by the Dorios and failed to report the actual value of their SDIRA to the IRS as required by law.

**Plaintiff Elias Zachos**

106.   Plaintiff Elias Zachos learned from a friend in early 2009 about an investment opportunity at a company called Triton Financial ("Triton") located in Austin, Texas that was run by Kurt Barton.  Zachos' friend had invested $250,000 with Barton and told Zachos that Barton's investment company was the solution to the poor returns and investment losses sustained by investors in the stock market.

107.   Zachos met with Barton in the early summer of 2009 to discuss a potential investment.  Barton advised Zachos that he could invest in Triton through his IRA, which could be converted to a SDIRA with Equity Trust and then the proceeds invested in Triton.

108.   Zachos went to Barton's office and Barton helped Zachos fill out the Equity Trust SDIRA paperwork to open an account and make the investment.  There were so many pages to fill

SNYDER ♦ DORENFELD, LLP

1   out that Zachos could not read them all or even understand them but Zachos trusted Barton so he

2   signed them and invested $159,000 in Triton through an Equity Trust SDIRA.

3       109.    Zachos received paper statements from time to time from Equity Trust showing that

4   his SDIRA was valued at $159,000.

5       110.    In September of 2009, Zachos learned that Barton was a Fraud Promoter through a

6   newspaper story indicating that a female investor in Triton had gone to Barton's office in Austin

7   and tried to kill him because she had learned that Barton had absconded with her investment

8   monies. Within days of that article, Zachos received a call from the FBI telling him that Triton was

9   being investigated and that the FBI was going to arrest Barton.

10      111.    Barton was tried and convicted in August of 2011 and received a sentence of 17

11  years for running a $75 million Ponzi scheme.

12      112.    Zachos repeatedly tried to contact Equity Trust to find out about his SDIRA account

13  assets, to close the SDIRA account and to change the valuation of his SDIRA to zero. Zachos also

14  received letters and emails from Equity Trust demanding payment of their outstanding fees.

15      113.    Zachos even signed up for an Equity Trust investor seminar in Texas so he could

16  meet a senior representative at Equity Trust and ask for help. Zachos met Edwin Kelly from

17  Equity Trust at the seminar and told him about his investment losses and plight with his Equity

18  Trust SDIRA. Kelly told him he would help him and handle it personally. Zachos never heard

19  from Kelly again after meeting him at the seminar in Texas and then found out Kelly had left

20  Equity Trust.

21      114.    Zachos tried numerous times to reach the Compliance Officer for Equity Trust via

22  phone or email. But Zachos always got underlings at Equity Trust who told him the reason he was

23  having problems was because he had not filled out his Equity Trust paperwork correctly.

24      115.    In May of 2012, Zachos was finally able to reach Jeff Bartlett, the Compliance

25  Officer for Equity Trust, by phone and request his help.  Bartlett told Zachos that he personally

26  would take care of getting him the information necessary to get his SDIRA value changed to zero,

27  and close his Equity Trust account. Bartlett told Zachos he would just have to pay some processing

28  fees. Zachos was very relieved.

SNYDER ♦ DORENFELD, LLP

116.    Zachos has never heard from Bartlett again although he has attempted to contact him several times. But Zachos has been hounded by Equity Trust to pay several hundred dollars in "administrative fees" or Equity Trust threatened to report the full value of his initial investment in his SDIRA to the IRS as a distribution which Zachos would then owe taxes on.

117.    Zachos has never learned what happened to the monies in his SDIRA and Kurt Barton is now serving time in a federal prison.

118.    Zachos' SDIRA statements from Equity Trust failed to accurately reflect the fair market value of his SDIRA assets. Equity Trust also failed to disclose that his SDIRA assets had been stolen by Barton and become worthless and that the purported security for his SDIRA assets was in default and no longer viable. Equity Trust also did not ascertain the actual value of the SDIRA assets owned by Zachos and failed to report the actual value of his SDIRA to the IRS as required by law.

**Plaintiff Gerald Watts**

119.    In 2010, Gerald Watts first learned of an investment opportunity with Chris Cornett who was located in Buda, Texas. Watts had a friend who had invested with Cornett and was very pleased with the investment and was getting a good return. Cornett had two companies that he sold investments through: International Forex Management, LLC and Global Wealth Management Group, LLC.

120.    Watts and his wife decided to meet with Cornett about a potential investment. Watts was concerned about the investment and did not want to jump right in. The Watts met Cornett at a restaurant in Austin, Texas in March of 2011. At that meeting, Cornett mentioned investing in foreign exchange currency futures but Watts did not understand what that really meant.

121.    Cornett also suggested at the meeting that Watts invest with Cornett through the use of a SDIRA. Cornett asked Watts if he had an IRA and Watts indicated that he did so Cornett told Watts he could convert his IRA to a SDIRA.

122.    Cornett also told Watts that he worked with a company called Equity Trust to establish SDIRAs for his investments and gave Watts the contact information for a woman named Heidi Beyer ("Beyer") who had a direct relationship with Equity Trust. Beyer was Cornett's

SNYDER ♦ DORENFELD, LLP

business partner and made all of the arrangements for investments in Cornett's companies through SDIRAs administered solely by Equity Trust. But Watts wanted to proceed cautiously and did not want to invest a lot of money initially so he decided not to convert his IRA until he was confident that Cornett's investments were really solid.

123. In April of 2011, Watts invested $5000 with Cornett. Watts had online access to his account with Cornett and was able to see his investment growing in value. Watts was so delighted with the returns he was receiving on this investment that he decided to invest more money with Cornett through a SDIRA with Equity Trust.

124. Watts contacted Beyer to start the process of opening an Equity Trust SDIRA. Watts wanted to convert an IRA he had with $18,227 in it to an Equity Trust SDIRA as Cornett had suggested.

125. Beyer put Watts in contact with John Bowens ("Bowens"), a representative of Equity Trust. Beyer indicated that Bowens was the exclusive contact for the Cornett investments through SDIRAs and that Cornett only used Equity Trust.

126. Beyer sent Watts a partially-completed Equity Trust application form with some information filled in by Beyer. Watts completed the application, went over the form with Beyer and then sent the Equity Trust SDIRA form back to Beyer.

127. On May 14, 2011, Beyer emailed Watts his SDIRA online account access information with Equity Trust including a user name and password so Watts could view his Equity Trust statement online.

128. When Watts viewed his Equity Trust SDIRA account valuation in June of 2011, he was very pleased to see the increase in value.

129. However, Watts never received stock certificates or other papers establishing his ownership in any of the Cornett-owned entities. All of Watts' Equity Trust SDIRA statements stated "Awaiting Receipt: Operating Agreement," which was needed for his SDIRA investment with Cornett. That "Operating Agreement" was never received by Equity Trust from Cornett or Beyer. On Memorial Day of 2011, a massive fire occurred on Watts' property. The fire came within 150 feet of Watts' home before firefighters were able to contain the blaze.

SNYDER ♦ DORENFELD, LLP

130.   In August of 2011, Watts' wife was mauled by a dog.  She had to go through six months of painful therapy and incurred expensive medical bills for her treatment.

131.   In September of 2011, Watts realized that he needed cash from his SDIRA to help out with the expenses from the fire and his wife's medical bills.  But Watts decided to wait until October of 2011 to see if he could forego having to take money out of his SDIRA because the investment was doing so well according to his Equity Trust SDIRA account valuation statements.

132.   Beyer was responsible for providing the valuation information for Watts' SDIRA and she would periodically update Watts' account with purported earnings from Cornett's investment ventures.  However, the SDIRA valuations provided by Beyer and from Cornett were all fraudulent since Cornett and Beyer had diverted all of their victims' SDIRA monies immediately after Equity Trust wired the monies to an account controlled by Cornett and/or Beyer.

133.   Equity Trust permitted Beyer to provide all of the fair market value information for Watts' SDIRA and the SDIRAs of the other Cornett/Beyer victims even though Beyer was not an independent third party.  She was a co-conspirator and Fraud Promoter.

134.   Then on October 25, 2011, Cornett sent out a devastating email to all of his investors indicating that the Department of Treasury and IRS had seized the computer at his home and that he was unsure what was going on.

135.   After receiving the email, Watts tried to call Beyer but all of her numbers had been disconnected.

136.   Watts then called the customer service number for Equity Trust.  Watts asked the Equity Trust representative how much money was in his SDIRA.  The representative said Watts had $0.16 in his SDIRA. Watts told the representative that he had checked his SDIRA account balance online in September and earlier in October and that his Equity Trust SDIRA account value was a little over $24,000.  Watts asked the Equity Trust representative how his account value could be $0.16.  The Equity Trust representative said they did not know and did not provide any further assistance.

137.   Watts then called and cancelled the credit card that Equity Trust had on file to charge Equity Trust fees.

CLASS ACTION COMPLAINT                                                                                      19

1    138.    In February of 2012, Watts received a bill from Equity Trust for $310.

2    139.    Since October of 2011, Watts has received numerous solicitations from Equity Trust

3    encouraging him to invest more monies through SDIRAs with Equity Trust.

4    140.    In May of 2012, Watts received an IRS Form 5498 stating that the fair market value

5    of his account was $18,227.56 - the exact amount Watts originally invested.

6    141.    Watts learned after his investment loss that Chris Cornett was a convicted felon who

7    had previously served 37 months for bank fraud.  Once he got out of prison, Cornett began

8    operating a Forex-pool fraud and absconded with over $14 million of investors' money including

9    that of Watts.

10   142.    Cornett learned how to execute the Forex/SDIRA investment scam, of which Watts

11   was one of the victims, while in prison.

12   143.    Cornett and Beyer were indicted recently for wire fraud and money laundering and

13   are awaiting trial.

14   144.    Watts' SDIRA statements from Equity Trust failed to accurately reflect the fair

15   market value of his SDIRA assets.  Equity Trust also failed to disclose that his SDIRA assets had

16   been stolen by Cornett and Beyer and become worthless and that the purported security for his

17   SDIRA assets was in default and no longer viable.  Equity Trust also did not ascertain the actual

18   value of the SDIRA assets owned by Watts and failed to report the actual value of his SDIRA to

19   the IRS as required by law.

20   **D.    The Custodians Aided and Abetted the Fraud**

21   145.    The conduct of the Custodians enabled, aided, abetted and facilitated the theft of the

22   investment monies of Plaintiffs and the Class Members who were targeted by the Fraud Promoters.

23   146.    The monies deposited into SDIRAs "administered" by the Custodians were stolen

24   from Plaintiffs and the Class Members through fraud, Ponzi schemes, and other criminal conduct.

25   147.    The Custodians knew that the Fraud Promoters were stealing the money invested by

26   Plaintiffs and the Class Members.

27

28

SNYDER ♦ DORENFELD, LLP

148.   In fact, the Custodians through their administration of the SDIRAs created the illusion that the SDIRAs of Plaintiffs and the Class Members were increasing in value and that the investments were profitable and legitimate.

149.   The Custodians periodically sent out investment account statements or made them available through the Internet to Plaintiffs and the Class Members showing what appeared to be extraordinary investment returns in their SDIRAs.   These actions created the illusion that the investments were providing significant returns and that the value of the SDIRAs was increasing.   In fact, the Fraud Promoters had absconded with the investment monies within days or weeks after the Custodians had wired the funds to bank accounts controlled by the Fraud Promoters.

150.   The Custodians are required to report the fair market value of the SDIRA assets annually on IRS Form 5498 and to report the value of any distributions to the SDIRA owner on Form 1099-R.   The Custodians, however, failed and refused to ascertain the fair market value of the SDIRAs owned by Plaintiffs and the Class Members through a "qualified, independent third party."   Instead, they reported the same value year after year unless, of course, the Fraud Promoters provided a greater value to the Custodian who then recorded it as the updated value of the SDIRA and further deceived Plaintiffs and the Class Members into believing their investments were increasing in value and secure.

151.   On information and belief, the Custodians failed and/or refused to comply or abide by the regulatory requirements applicable to Custodians of SDIRAs in the rendition of their services as Custodians to Plaintiffs and the Class Members.

152.   Plaintiffs and the Class Members often reinvested their money in the fraudulent investments because they appeared to pay a much better return than any alternative investment opportunity.   At least the investment returns appeared much better according to the misleading SDIRA account statements prepared by the Custodians.

153.   The Custodians also knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiffs and the Class Members "appeared" in the account statement of the SDIRAs regardless of whether the accrued interest on the investment was actually deposited in

SNYDER ♦ DORENFELD, LLP

1   the accounts owned by Plaintiffs and the Class Members. For the majority of victims, the accrued

2   interest was not deposited.

3   154.   The IRS requires that IRA owners withdraw at least a minimum amount, known as a

4   Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the

5   year an investor turns age 70 ½. Thus the RMD requirement demands that retirement assets have a

6   certain degree of liquidity. While RMDs may vary based on the ages of the investor and

7   beneficiary, as well as the rate of return earned on the investment, RMD amounts on most

8   retirement accounts are usually less than 1/20 of the principal in the retirement account.

9   155.   The Custodians knew that the investments of Plaintiffs and the Class Members were

10   completely illiquid and that the Fraud Promoters were misappropriating the money invested by

11   Plaintiffs and the Class Members. As a result, the investment accounts frequently failed to

12   maintain enough cash to pay RMDs for elder investors such as Levine, Watts and Zachos. In

13   addition, because the value of the SDIRAs were grossly inflated, so were the RMD amounts

14   subjecting the Custodians' customers to greater penalties and/or tax consequences upon a failure to

15   take the distribution.

16   156.   Although the Custodians charged significant fees for their "administrative services,"

17   they also failed to perform one of the few "duties" they acknowledge exists for custodians of

18   SDIRAs: they are to maintain custody of the paperwork proving ownership of a designated asset by

19   the SDIRA.

20   157.   The Custodians failed and refused to maintain documents establishing the

21   ownership of the assets in their customers' SDIRAs and, in fact, never accurately identified or

22   verified the identity of the assets purportedly owned by the SDIRA of the Plaintiffs and the Class

23   Members.

24   158.   The Custodians also permitted illegal transfers of SDIRA assets to bank accounts

25   controlled by Fraud Promoters without the knowledge, permission or assent of the actual SDIRA

26   account holder through incomplete, forged SDIRA documents.

27   159.   On April 4, 2012, the Better Business Bureau ("BBB") suspended the BBB

28   accreditation of Equity Trust due to its repeated failure to address consumer complaints about

SNYDER ♦ DORENFELD, LLP

1   service issues and the failure to respond to specific consumer complaints that demonstrated a

2   pattern of unacceptable conduct.  Equity Trust attempted on April 19, 2012 to persuade the BBB to

3   lift the suspension.  The BBB refused and has indicated that the suspension will remain in effect for

4   at least six months.

5   160.   It is common industry knowledge and some of the Custodians have publicly

6   acknowledged the fact that SDIRAs were being used by the Fraud Promoters to swindle investors.

7   For example, Equity Trust has publicly acknowledged the fact that it is and was aware that its

8   SDIRAs were being used by the Fraud Promoters to swindle Equity Trust customers and that such

9   fraud claims are escalating.  Despite that fact, the Custodians continued to market and affiliate with

10  the Fraud Promoters after such was widely known in the industry and that such fraud was

11  escalating.

12  161.   The Custodians have publicly acknowledged that although they claim to be

13  "passive" custodians, they have stopped "allowing customers to invest" in some SDIRA programs

14  upon discovering issues with certain investment promoters.

15  162.   Upon information and belief, although the Custodians classify themselves as

16  "Passive Custodians," the conduct of these Custodians appears to fall outside of a Passive

17  Custodian role.

18  163.   Upon information and belief, the Custodians acted outside of a Passive Custodian

19  capacity by: jointly marketing their SDIRA custodial services with Fraud Promoters and other

20  investment promoters; running background checks on investment promoters but failing and

21  refusing to disclose the results of the background checks to their affected customers even if the

22  Custodian determined that the investment scheme was a fraud;  and continuing to process new

23  investments through SDIRAs with certain investment promoters even though the Custodian had

24  actual knowledge that the investment promoter was perpetuating a fraudulent scheme.

25  164.   The Fraud Promoters who swindled Plaintiffs and the Class Members could not

26  have pulled off these multi-million dollar scams without the direct assistance of the Custodians.

27  165.   The Fraud Promoters kept tight control over the direction of investments and

28  creation of SDIRAs with the Custodians.   The Fraud Promoters wanted to make sure they

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                                      23

controlled the investment and that communications with investors such as Plaintiffs and the Class Members were consistent so that no suspicions were aroused.

166.     The Custodians aided, facilitated and supported the Fraud Promoters' control of the victims, so they could maintain a revenue stream comprised of hundreds or thousands of dollars per year per account from each victim for essentially doing nothing.

167.     In fact, the Custodians knew that the Fraud Promoters were defaulting on loans and notes in the SDIRAs owned by Plaintiffs and the Class Members repeatedly over multiple years but turned a blind eye.   The Custodians' failure to accurately report the value of the SDIRAs of Plaintiffs and the Class Members resulted in Plaintiffs and the Class Members being unaware that their investment monies had actually been stolen, although their SDIRAs appeared to be increasing in value.

168.     The Custodians viewed and treated the Fraud Promoters as their partners and clients, not Plaintiffs and the Class Members, which is why when the money ran out and the Ponzi schemes crumbled, the Custodians refused to provide assistance or help Plaintiffs and Class Members understand what happened to their investment money.

169.     The Custodians permit the Fraud Promoters to provide the fair market value of the assets of the SDIRAs of their victims but once the fraudulent scheme is exposed the Custodians require their customers to provide third party proof that the SDIRA is worthless and refuse to modify the value of the SDIRA unless the victim/customer pays the Custodian's administrative fees.

170.     The Custodians gave Plaintiffs and the Class Members a false sense of security by making false and deceptive representations that their "investments" would be safe, insured, accurately administered, and legally sound.  Plaintiffs and the Class Members, relying on those representations, tendered their hard-earned money to the Custodians, while the Custodians enabled the Fraud Promoters to steal the monies invested by Plaintiffs and the Class Members.  Many investors lost their entire life savings.

## V.   CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action on their behalf and as a class action pursuant to Rules 23(a) and (b) (3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") defined as all persons or entities who invested in or held an investment through a SDIRA administered by Defendants Entrust and Equity Trust from January 1, 2006 until the present (the "Class Period") and that was offered, sold or solicited by the Fraud Promoters.

172.    Plaintiffs also bring this action on behalf of a subclass (the "California Subclass") defined as all California residents who invested in or held an investment through a SDIRA administered by Defendants Entrust and Equity Trust from January 1, 2006 until the present.

173.    Plaintiffs also bring this action on behalf of a subclass (the "California Senior Subclass") defined as all California residents over 65 years of age who invested in or held an investment through a SDIRA administered by Defendants Entrust and Equity Trust from January 1, 2006 until the present that was offered, sold or solicited by the Fraud Promoters.

174.    Excluded from the Class are: (a) Defendants; (b) Members of the immediate family of each of the Defendants that are not corporate entities; (c) any person who was an executive officer, employee and/or director or their spouse, child or parent of any Defendant during the Class Period; (d) any person, firm, trust, corporation, officer, director or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; (e) any independent contractor of any Defendants who participated in the sale of the investment vehicles outlined herein; (f) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party; and (g) those persons who are named litigants or have opted in to a class of persons in litigation against these Defendants for similar claims.

175.    The Class is so numerous that joinder of all Class Members is impracticable.  While the exact number of Class Members can only be determined by appropriate discovery, Plaintiffs believe that the Class Members total over 1,000.

176.    Plaintiffs' claims are typical of the claims of the other Class Members.  Plaintiffs and all Class Members sustained damages as a result of the Custodians' unlawful course of conduct.

SNYDER ♦ DORENFELD, LLP

177.   Plaintiffs will fairly and adequately protect the interest of the Class Members and have retained counsel competent and experienced in class action litigation.   Plaintiffs have no interests that are contrary to or in conflict with those of the Class Members that Plaintiffs seek to represent.

178.   A class action is superior to other methods for the fair and efficient adjudication of this controversy.   The expense and burden of individual litigation make it virtually impossible for the Class Members individually to seek redress for the wrongful conduct alleged herein.

179.   Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members.   Among the questions of law and fact common to the Class are:

   a.   Whether the Custodians made false and misleading representations to Plaintiffs and the Class;

   b.   Whether the Custodians engaged in false, misleading and deceptive advertising;

   c.   Whether the Custodians engaged in financial elder abuse of Plaintiff Stan Levine and the California Senior Subclass Members;

   d.   Whether the Custodians have violated California's Unfair Competition Law;

   e.   Whether the acts of the Custodians constitute violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act;   *See, e.g.,* 15 U.S.C. § 78u, *et seq.*;

   f.   Whether Plaintiffs and the Class Members have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

180.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

181.   The names and addresses of the Custodians' customers who purchased the Custodians' services during the Class Period are obtainable from information in the possession of

SNYDER ♦ DORENFELD, LLP

the Custodians and/or their agents.  Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

## COUNT I

## CONVERSION

### (Against All Defendants)

182.   Plaintiffs incorporate the allegations contained in all of the prior paragraphs of this Complaint as if restated and fully set forth herein.

183.   As described more fully above, the Fraud Promoters' "investment" programs that Plaintiffs and the Class Members invested in, were bogus.  The Custodians aided and abetted Ponzi Schemes and other fraudulent conduct that permitted the Fraud Promoters to exercise unauthorized dominion and control over the property of Plaintiffs and the Class Members.

184.   The Custodians' conversion has permanently deprived Plaintiffs and the other Class Members of their property, causing damage.

185.   Plaintiffs and the Class Members have repeatedly demanded that their funds be returned but the Custodians did not in fact return them.

186.   The Custodians' actions have directly caused injury and damages to Plaintiffs and the Class Members.

## COUNT II

## INTENTIONAL FRAUD

### (Against All Defendants)

187.   Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

188.   The Custodians made several misrepresentations to the public at large and to Plaintiffs and the Class Members as set forth above.  In particular, the Custodians sent account statements to Plaintiffs and the Class Members stating that the SDIRA accounts had significant value when in fact the money had been stolen.  The Custodians also falsely stated that the "investments" made by Plaintiffs and the Class Members would be safe, insured, accurately administered, and legally sound when in fact they were not.

SNYDER ♦ DORENFELD, LLP

189.   The Custodians knew that these statements were false when they made them.

190.   The Custodians intended for Plaintiffs and the Class Members to rely upon their false statements.

191.   Plaintiffs and the Class Members did rely on the Custodians' false statements, and would never have invested in and continued to invest in SDIRAs with the Custodians were it not for the false statements.

192.   The Custodians have enjoyed substantial financial gain, and Plaintiffs and the Class Members have suffered severe financial loss, as a result of these false statements.

## COUNT III

## CONSPIRACY

(Against All Defendants)

193.   Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

194.   The Custodians were engaged in a conspiracy with the Fraud Promoters to obtain money and property from Plaintiffs and the Class Members through fraudulent means, including the fraudulent misstatements alleged herein.

195.   The Custodians agreed to commit the unlawful acts set forth herein, and the other violations of the law that were intended to advance and that did in fact advance and facilitate the objectives of the conspiracy.

196.   Each and every one of the Custodians have committed overt acts in furtherance of the conspiracy, including but not limited to the acts set forth above in part to induce Plaintiffs and the Class Members to invest in fraudulent enterprises.

197.   The Custodians joined with the Fraud Promoters and planned together this fraudulent course of conduct.

198.   As a direct, proximate and readily foreseeable consequence of the conspiracy and the acts committed in furtherance thereof, Plaintiffs and the Class Members have been harmed by the loss of their money and property.

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                                    28

199.    As a direct, proximate and readily foreseeable consequence of the conspiracy and the acts committed in furtherance thereof, Plaintiffs and the Class Members have suffered substantial monetary damages in an amount to be proven at trial, and will continue to incur costs, expenses and legal fees as a result.

**COUNT IV**

**VIOLATION OF CALIFORNIA'S ELDER ABUSE AND DEPENDENT ADULT**

**CIVIL PROTECTION ACT (Welfare and Institutions Code § 15600, _et seq._)**

(Against All Defendants)

200.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

201.    This cause of action is asserted on behalf of Plaintiff Levine and the California Senior Subclass.

202.    Under California's Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code § 15600, _et seq._, unscrupulous professionals or businesspersons, or persons posing as such may not financially exploit a senior (65 years of age or older) on the basis of their age, health or mental condition by overcharging for services or products and using deceptive or unfair business practices.

203.    The Custodians wrongfully took the monies and properties of Plaintiff Levine and the California Senior Subclass Members, who are 65 years of age or older, and intended to defraud them and unlawfully obtain possession of their retirement funds.

204.    The Custodians wrongfully took the property of Plaintiff Levine and the California Senior Subclass Members.

205.    As a result of the wrongful conduct of the Custodians, Plaintiff Levine and the California Senior Subclass Members incurred economic harm and losses.

206.    As a direct and proximate result of this wrongful conduct, Plaintiff Levine and the California Senior Subclass Members sustained injuries.

SNYDER ♦ DORENFELD, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

# COUNT V

## UNFAIR COMPETITION

### (Business and Professions Code § 17200 *et seq.*)

(Against all Defendants)

207.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

208.    Business and Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

209.    This private Attorney General action is brought by Plaintiffs Charles and Sandra Brissette on behalf of the California Subclass to remedy violations of California's state consumer protection statutes arising out of the Custodians' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

210.    The Custodians, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of Business and Professions Code § 17200 *et seq.*

211.    This is a private Attorney General action brought on behalf of the general public. As detailed herein, the Custodians have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations.

212.    The Custodians' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving "investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by the Custodians constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's Unfair Competition Law.

213.    The conduct of the Custodians is of a continuing nature that requires prompt relief. The Custodians have uniformly represented to the general public through their representatives that their actions were legally appropriate when in fact they were not and/or have concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary

CLASS ACTION COMPLAINT                                                                                         30

1   to make the Custodians' other representations not misleading for want of disclosure of such

2   omitted facts or because the Custodians possess superior knowledge of the true facts.

3       214.   Plaintiffs Charles and Sandra Brissette and the California Subclass Members have

4   suffered, and continue to suffer, actual injury in fact due to the willful acts of the Custodians that

5   are contrary to the public policy of California, are substantially injurious to consumers of

6   California and constitute unfair trade practices and competition under Business & Professions Code

7   § 17200, *et seq.*

8       215.   Based upon the obligations imposed upon the Custodians and their experience in the

9   industry, the Custodians either knew, recklessly disregarded, reasonably should have known or

10  were obligated under the law to provide correct and prompt information on the status of Plaintiffs'

11  SDIRAS and notify Plaintiffs if said SDIRAS were in default.  The Custodians failed to do so.  As

12  a result, Plaintiffs Charles and Sandra Brissette and the California Subclass Members were

13  subjected to unlawful, unfair and/or fraudulent treatment and the Custodians were unjustly

14  enriched and should be ordered to pay restitution pursuant to Business and Professions Code §§

15  17203 and 17204.

16      216.   Members of the general public also face irreparable harm, such as, *inter alia*, not

17  being fully informed of the true facts, having the status of their SDIRA wrongfully misrepresented,

18  and/or the associated financial information as to the value of their investment being falsely

19  reported.

20      217.   Equitable relief is appropriate to ensure adequate controls are in place to remedy the

21  wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what

22  transpired.   Pursuant to Business and Professions Code § 17203, Plaintiffs are entitled to

23  preliminary and permanent injunctive relief requiring the Custodians to cease this unfair

24  competition, as well as disgorgement of all of the Custodians' profits associated with this unfair

25  competition.

26      218.   Plaintiffs Charles and Sandra Brissette and the California Subclass Members seek

27  an order from this Court prohibiting the Custodians from engaging or continuing to engage in the

28  unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                        31

that the Custodians perform their obligations under the law and reimburse Plaintiffs Charles and Sandra Brissette and the California Subclass Members all monies owed them as alleged in this Complaint.

219.    Plaintiffs Charles and Sandra Brissette and the California Subclass Members additionally request an order from this Court requiring that the Custodians make restitution of profits and return or pay to Plaintiffs Charles and Sandra Brissette and the California Subclass Members all of the Custodians' ill-gotten gains obtained from the illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had the Custodians complied with their legal obligations, or, as equity requires.

220.    The above-described unlawful, unfair or fraudulent business acts and practices engaged in by the Custodians continue to this day and/or present a threat of irreparable harm to the general public.  The Custodians have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

221.    Pursuant to Business & Professions Code § 17203, Plaintiffs Charles and Sandra Brissette, on behalf of the California Subclass and the general public, seek a temporary, preliminary and/or permanent order from this Court prohibiting the Custodians from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering the Custodians or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by the Custodians and/or their representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

222.    Plaintiffs Charles and Sandra Brissette and the California Subclass Members further request a court order that an asset freeze or constructive trust be imposed over all monies in the Custodians' possession which rightfully belong to Plaintiffs and the California Subclass Members.

223.    Plaintiffs Charles and Sandra Brissette request judgment and restitution from the Custodians in an amount to be proven at trial for unfair, fraudulent and illegal business practices, treble damages and attorney's fees together with court costs.

SNYDER ♦ DORENFELD, LLP

1

SNYDER ♦ DORENFELD, LLP

**COUNT VI**

**VIOLATION OF THE CONSUMER FINANCIAL PROTECTION BUREAU'S**

**REGULATIONS**

*(15 U.S.C. § 78u, et seq.)*

(Against All Defendants)

224.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

225.    Financial entities that engage in conduct that poses a risk to consumers as well as financial entities that engage in unfair, deceptive or abusive acts or practices are regulated by and subject to enforcement actions from the Consumer Financial Protection Bureau ("CFPB"), which was created by the Dodd-Frank Act, 15 U.S.C. § 78u, *et seq.*

226.    The Custodians herein materially interfered with  their customers' ability to understand a term or condition of a consumer financial product or service; took unreasonable advantage of their customers' lack of financial savvy; and precluded the customers' ability to protect themselves in the selection or use of consumer financial products or services.

227.    The aforementioned conduct by the Custodians constitutes unfair, deceptive and misleading practices by financial service firms within the meaning of the CFPB Rules.

228.    Plaintiffs and the Class Members have suffered damages as a proximate result of the Custodians' violation of the CFPB rules.

**COUNT VII**

**NEGLIGENT MISREPRESENTATION**

(Against All Defendants)

229.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

230.    The Custodians made several misrepresentations to the public at large and to Plaintiffs and the Class Members as set forth above.  In particular, the Custodians sent account statements to Plaintiffs and the Class Members stating that the SDIRA accounts had significant value when in fact the money had been stolen.  The Custodians also falsely stated that the

CLASS ACTION COMPLAINT                                                                                          33

"investments" made by Plaintiffs and the Class Members would be safe, insured, accurately administered, and legally sound when in fact they were not.

231.   The Custodians should have known that these statements were false when they made them.

232.   The Custodians intended for Plaintiffs and the Class Members to rely upon their false statements.

233.   Plaintiffs and the Class Members did rely on the Custodians' false statements and would never have invested through SDIRAs with the Custodians were it not for the false statements.

234.   The Custodians have enjoyed substantial financial gain, and Plaintiffs and the Class Members have suffered severe financial loss as a result of their reliance on the Custodians' false statements.

## COUNT VIII
## CONSTRUCTIVE TRUST

(Against All Defendants)

235.   Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

236.   Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the Custodians sued herein was the agent and employee of each of the remaining Custodians and was at all times acting within the purpose and scope of such agency and employment.

237.   As a proximate result of the Custodians' fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiffs have sustained damages.

238.   By reason of the fraudulent and otherwise wrongful manner in which the Custodians obtained their alleged right, claim or interest in and to the property, the Custodians, each of them, have no legal or equitable right, claim or interest therein.

239.    Instead, the Custodians, and each of them, are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs and the Class Members with the duty to convey the same to Plaintiffs and the Class Members forthwith.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, demand upon the Custodians jointly and severally for:

1.    An Order certifying the case as a class action;

2.    An Order appointing Plaintiffs as the Class Representatives of the Class, Plaintiff Levine as the Class Representative of the California Senior Subclass and Plaintiffs Charles and Sandra Brissette as the Class Representatives of the California Subclass;

3.    An Order appointing undersigned counsel and their firms as counsel for the Class;

4.    As to Counts I, II and III, compensatory damages, punitive damages, and attorney's fees pursuant to the private Attorney General statutes;

5.    As to Count IV, compensatory damages, punitive damages, statutory penalties, and attorney's fees under statute and private Attorney General statutes;

6.    As to Count V, restitution, disgorgement of profits, statutory penalties, punitive damages, injunctive relief, and attorney's fees under statute and private Attorney General statutes;

7.    As to Count VI, disgorgement of profits, statutory penalties, injunctive relief, and attorney's fees under statute and private Attorney General statutes;

8.    As to Count VII, compensatory damages and attorney's fees pursuant to the private Attorney General statutes;

9.    As to Count VIII, an order that a constructive trust be imposed over all monies in the Custodians' possession which rightfully belong to Plaintiffs and/or an asset freeze of monies belonging to the Custodians, and attorney's fees under private Attorney General statutes;

10.    As to all counts, pre and post-judgment interest as allowed by law;

SNYDER ♦ DORENFELD, LLP

11.     As to all counts, an award of taxable costs; and

12.     As to all counts, any and all such further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

Respectfully Submitted:

Dated:  July 27, 2012                           BURSOR & FISHER, P.A.

By: _____
                                                        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:  (818) 865-4010
Email: davidd@sd4law.com
            mwb@sd4law.com

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
7857 W. Sample Rd., Suite 140
Coral Springs, FL 33065
Telephone: (954) 663-5818
Facsimile:  (954) 341-3568
Email: clerman@lermanfirm.com

Attorneys for Plaintiffs

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                    36