SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:  (818) 865-4010
Email: davidd@sd4law.com
         mwb@sd4law.com

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile:  (954) 341-3568
Email: clerman@lermanfirm.com

BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANLEY LEVINE, CHARLES BRISSETTE, and SANDRA BRISSETTE individually, and on behalf of a class of similarly situated persons,<br><br>        Plaintiffs,<br>v.<br><br>THE ENTRUST GROUP, INC., ENTRUST ADMINISTRATION, INC., ENTRUST NEW DIRECTION IRA, INC. n/k/a NEW DIRECTION IRA,  INC., and ENTRUST ARIZONA, LLC n/k/a VANTAGE RETIREMENT PLANS, LLC,<br><br>        Defendants. | Case No.: C12-03959 WHA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

SNYDER ♦ DORENFELD, LLP

# I.  INTRODUCTION

1.    This is a class action lawsuit against The Entrust Group, Inc., Entrust Administration, Inc., Entrust New Direction IRA, Inc., and Vantage Retirement Plans, LLC. ("Defendants' or the "Custodians") for aiding and abetting fraudulent schemes related to investments made by Plaintiffs and the Class Members.

2.    Plaintiffs and the Class Members invested their money into Self-Directed Investment Retirement Account ("SDIRAs").  A SDIRA is an individual retirement account ("IRA") held by a trustee or custodian that permits investment in a broader set of assets than is permitted by most IRA custodians.  It is estimated that approximately $94 billion was held in SDIRAs in the United States in 2011.

3.    Plaintiffs and the Class Members were convinced to invest in the SDIRAs by Ephren Taylor and Matthew Jennings.  Taylor and Jennings were "Fraud Promoters," a phrase used by the SEC to describe individuals who devise and orchestrate Ponzi schemes to defraud innocent investors.  Taylor and Jennings insisted that Plaintiffs and the Class Members invest in SDIRAs administered by specific custodians.  The use of established companies like Defendants provided a sense of legitimacy to an otherwise fraudulent investment scheme and helped entice inexperienced investors to invest their money into the fraudulent investments promoted by Taylor and Jennings. Taylor and Jennings frequently emphasized Defendants' size and experience as evidence of their credibility as investment advisers.

4.    Taylor and Jennings invested the money deposited by Plaintiffs and the Class Members in their SDIRAs in "investments" that were fraudulent, illusory or non-existent. Defendants aided and abetted the fraud by periodically sending out investment account statements showing extraordinary investment returns or consistent valuation in the SDIRAs when in fact Taylor and Jennings were absconding with the victims' money or the SDIRA was worthless.

5.    Even when Defendants had actual knowledge that the SDIRAs of the victims, including Plaintiffs and the other Class Members, were worthless, Defendants failed and refused to reduce the valuation of the SDIRAs because Defendants' administrative fees were based upon a percentage of the total fair market value of the SDIRAs and therefore Defendants were incentivized

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

to keep the SDIRA account value at the highest possible valuation and hide the theft of the SDIRA owners' monies.

6.      If Plaintiffs and the other Class Members refused to pay Defendants' administrative fees, which were based upon an inflated valuation of the SDIRA of Plaintiffs and the other Class Members, then Defendants would threaten to send the IRS and the SDIRA owners a 1099 showing that Plaintiffs and the other Class Members had received a distribution from their SDIRA at its inflated value when, in fact, Defendants knew that the SDIRA of Plaintiffs and the Class Members was worthless.

7.      Defendants were also obligated to report annually to the IRS the fair market value of the SDIRAs.  Defendants, however, failed to ascertain the actual value of the SDIRAs owned by Plaintiffs and the Class Members.  Instead, they reported the same value each year unless Taylor or Jennings provided a greater value to the Defendant in which case the Defendant reported the increased value to the victim.

8.      Defendants knew, based upon calls from their own SDIRA customers complaining that they were unable to reach Taylor or Jennings or unable to liquidate their SDIRAs or based upon subpoenas received from regulatory agencies such as the SEC or state securities divisions, that the Taylor and Jennings were defaulting on loans, notes and other "investments" included in the SDIRAs of Plaintiffs and the other Class Members.  Nevertheless, they failed to disclose that Taylor and Jennings were stealing the money invested by Plaintiffs and the Class Members.  Many of the victims lost their entire life savings.

## II.   JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 (d) (2) and the Class Action Fairness Act.  Plaintiffs and certain Defendants are citizens of different states.  The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Defendants pursuant to, *e.g.*, 18 U.S.C. § 1965, the Due Process Clause of the U.S. Constitution, and the Code of Civil Procedure § 410.10. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional

claims arising under California state law for violation of California's Unfair Competition Law (Business and Professions Code § 17200, *et seq.*).

11.     Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Defendants and Class Members reside in this jurisdiction.

12.     Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service while soliciting consumers within the definition of the California's Unfair Competition Law.

### III.   THE PARTIES

13.     Plaintiff Stanley Levine ("Levine") is 85 years old and a resident of Newport Beach, California.  In 2008, Levine invested approximately $150,000 in a fraudulent enterprise resulting in a total loss of his investment.

14.     Plaintiff Charles Brissette is a resident of Glendale, California.  In or about July of 2006, Mr. Brissette invested approximately $23,000 in a fraudulent enterprise resulting in a total loss of his investment.

15.     Plaintiff Sandra Brissette is a resident of Glendale, California.  In or about July of 2006, Mrs. Brissette invested approximately $61,000 in a fraudulent enterprise resulting in a total loss of her investment. At all times material hereto, Charles Brissette and Sandra Brissette were husband and wife.

16.     Defendant The Entrust Group is a Delaware corporation with its principal place of business in Oakland, California.  The Entrust Group touts itself as the "world's premier provider of account administration services for self directed IRAs" and "the only self-directed IRA administrator that serves you right in your community."  The Entrust Group, until December of 2011, had a national network of affiliated companies that were franchisees/licensees of The Entrust Group.  The Entrust Group and the Entrust franchises/licensees referred to themselves collectively as "Entrust" in their marketing and advertising documents, corporate email solicitations and newsletters, their websites, their webinars and seminars, their SDIRA forms and documents, and their correspondence to SDIRA clients including Plaintiffs and the other Class Members.

SNYDER ♦ DORENFELD, LLP

17. All Entrust licensees/franchisees had "click throughs" on their websites such that a person reviewing the website of an Entrust licensee/franchisee would "clickthrough" to a list of all seminars, webinars and conferences nationwide sponsored by Entrust.

18. The owners of the Entrust licensees/franchisees contributed articles to the Entrust newsletter that was sent to all current Entrust clients and prospective Entrust clients.

19. Defendant Entrust Administration, Inc. is a California corporation with its principal place of business in Los Angeles, California.  Entrust Administration, Inc. is part of The Entrust Group.  Entrust Administration, Inc. was frequently mentioned in marketing materials and other documents prepared by the other Defendants.

20. Defendant Entrust Arizona, LLC n/k/a Vantage Retirement Plans, LLC ("Entrust Arizona") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.  Until December, 2011, Entrust Arizona was a franchisee/licensee of The Entrust Group and considered a part of Entrust Administration, Inc.

21. Defendant Entrust New Direction IRA, Inc. n/k/a New Direction IRA, Inc. ("Entrust New Direction") is a Colorado corporation with its principal place of business in Denver, Colorado.  Until December, 2011, Entrust New Direction was a franchise of The Entrust Group and considered a part of Entrust Administration, Inc.

22. At all times material hereto, Defendant Entrust Administration, Inc. was a wholly-owned subsidiary of Defendant The Entrust Group.

23. At all times material hereto, each of the Defendants acted as part of a national joint venture in a common enterprise to sell SDIRA custodial services to the public including Plaintiffs and the other Class Members.  The Entrust Group, through its Chief Operating Officer, oversaw all franchise operations including business practices and record systems of the national network of local offices of Entrust licensees/franchisees.  SDIRA account statements were often sent to Plaintiffs and to Class Members that included the names of multiple Entrust entities.  For example, Plaintiff Levine received statements that referred to both Entrust Arizona and The Entrust Group. Plaintiffs Charles and Sandra Brissette received statements that referred to both Entrust New Direction and The Entrust Group.

SNYDER ♦ DORENFELD, LLP

24.     The Entrust Group has an internal policy that even if it has actual notice that an investment scheme is fraudulent, it will not disclose such fraud to its affected SDIRA customers and will continue to open new SDIRA accounts for investments with the known fraudulent investment scheme until it is required by regulatory authorities to stop taking investments from a particular Fraud Promoter.

25.     Certain other individuals and entities who were involved in the fraudulent enterprises that damaged Plaintiffs and the Class Members are not sued because they are either under criminal investigation or already in prison, their assets are being pursued by a trustee/receiver, or further collection efforts would be fruitless.

## IV.   FACTUAL ALLEGATIONS

### A.     SDIRAs and Defendants' Role in the Fraud Perpetrated on Plaintiffs and the Class Members

26.     Investors in SDIRAs are permitted to invest in a variety of nontraditional investment options of their own choosing, including tax lien certificates, promissory notes, real estate, businesses, and LLCs.  Traditionally, few large investment companies or banks will administer SDIRAs because of their complexity.

27.     SDIRAs are administered by custodians or trustees.  A stark contrast exists, however, between the "administration" performed by trustees and custodians of SDIRAs, as compared to the "administration and management" performed by the trustees and custodians of traditional IRAs.

28.     The trustees and custodians of traditional IRAs are considered fiduciaries of the IRA account such that the trustees and custodians are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done legally and correctly.

29.     Custodians of SDIRAs, however, deny any type of fiduciary responsibilities even though they receive significant fees that are based upon a percentage of the purported value of the SDIRA for administering an SDIRA.  In fact, Defendants employ complex non-negotiable form contracts that seek to significantly limit their liability to their customers including Plaintiffs and the

SNYDER ♦ DORENFELD, LLP

Class Members.  Defendants have made hundreds of millions of dollars while claiming to "administer" SDIRAs that have resulted in many of their customers losing their entire life savings (which were invested in SDIRA "investments" that were illegal, illusory, non-existent, or failing).

**B.     The Investments Made by Plaintiffs and the Class**

30.     Plaintiffs and the Class Members, at the urging of Taylor and Jennings, invested in fraudulent investment schemes through SDIRAs.  Indeed, Taylor and Jennings could not have obtained the monies in the retirement accounts of Plaintiffs and the Class Members without using a SDIRA since that is the only investment vehicle that permits unregulated, non-traditional investments.

31.     Taylor and Jennings were not legitimate investment advisers but instead sought to defraud Plaintiffs and the Class Members.

32.     Taylor and Jennings mandated that Plaintiffs and the Class Members invest in SDIRAs administered by Defendants.  Taylor and Jennings were acutely aware that their affiliation with and use of Defendants provided a sense of legitimacy to an otherwise fraudulent investment scheme and enticed inexperienced investors, who might otherwise be more cautious, into an investment scam because they believed they were protected by large, purportedly well-funded companies with trustworthy names like "Entrust."

33.     To "sell" their victims, Taylor and Jennings frequently emphasized Defendants' size and experience as further evidence of their strength and credibility as a successful investment adviser.  Taylor and Jennings also told their intended victims that they had been "approved" by Defendants thus further enhancing their credibility with their targets.

34.     Taylor and Jennings also knew that the SDIRAs of Plaintiffs and the Class Members were set up to automatically renew or "rollover" each year such that Plaintiffs and the Class Members could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or "choose" to reinvest.

SNYDER ♦ DORENFELD, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNYDER ♦ DORENFELD, LLP

## C.       Defendants Aided and Abetted the Fraud

35.     Defendants' conduct enabled, aided, abetted and facilitated the theft of the investment monies of Plaintiffs and the Class Members who were targeted by Taylor and Jennings.

36.     The monies deposited into SDIRAs "administered" by Defendants were stolen from Plaintiffs and the Class Members through fraud, Ponzi schemes, and other criminal conduct.

37.     Defendants knew that Taylor and Jennings were stealing the money invested by Plaintiffs and the Class Members.

38.     In fact, Defendants through their administration of the SDIRAs created the illusion that the SDIRAs of Plaintiffs and the Class Members were increasing in value and that the investments were profitable and legitimate.

39.     Defendants periodically sent out investment account statements or made them available through the Internet to Plaintiffs and the Class Members showing what appeared to be extraordinary investment returns in their SDIRAs.   These actions created the illusion that the investments were providing significant returns and that the value of the SDIRAs was increasing.  In fact, Taylor and Jennings had absconded with the investment monies within days or weeks after Defendants had wired the funds to bank accounts they controlled.

40.     Defendants are required to report the fair market value of the SDIRA assets annually on IRS Form 5498 and to report the value of any distributions to the SDIRA owner on Form 1099-R.  Defendants, however, failed and refused to ascertain the fair market value of the SDIRAs owned by Plaintiffs and the Class Members through a "qualified, independent third party."  Instead, they reported the same value year after year unless, of course, Taylor or Jennings provided a greater value to the Custodian who then recorded it as the updated value of the SDIRA and further deceived Plaintiffs and the Class Members into believing their investments were increasing in value and secure.

41.     On information and belief, Defendants failed and/or refused to comply or abide by the regulatory requirements applicable to custodians of SDIRAs in the rendition of their services to Plaintiffs and the Class Members.

42.     Plaintiffs and the Class Members often reinvested their money in the fraudulent investments because they appeared to pay a much better return than any alternative investment opportunity.   At least the investment returns appeared much better according to the misleading SDIRA account statements prepared by Defendants.

43.     Defendants also knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiffs and the Class Members "appeared" in the account statement of the SDIRAs regardless of whether the accrued interest on the investment was actually deposited in the accounts owned by Plaintiffs and the Class Members.   For the majority of victims, the accrued interest was not deposited.

44.     The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the year an investor turns age 70 ½.   Thus the RMD requirement demands that retirement assets have a certain degree of liquidity. While RMDs may vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment, RMD amounts on most retirement accounts are usually less than 1/20 of the principal in the retirement account.

45.     Defendants knew that the investments of Plaintiffs and the Class Members were completely illiquid and that Taylor and Jennings were misappropriating the money invested by Plaintiffs and the Class Members.   As a result, the investment accounts frequently failed to maintain enough cash to pay RMDs for elder investors such as Levine.   In addition, because the value of the SDIRAs were grossly inflated, so were the RMD amounts subjecting Defendants' customers to greater penalties and/or tax consequences upon a failure to take the distribution.

46.     Although Defendants charged significant fees for their "administrative services," they also failed to perform one of the few "duties" they acknowledge exists for custodians of SDIRAs: to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.

47.     Defendants failed and refused to maintain documents establishing the ownership of the assets in their customers' SDIRAs and, in fact, never accurately identified or verified the identity of the assets purportedly owned by the SDIRAs of Plaintiffs and the Class Members.

SNYDER ♦ DORENFELD, LLP

48.     Defendants also permitted illegal transfers of SDIRA assets to bank accounts controlled by Taylor and Jennings without the knowledge, permission or assent of the actual SDIRA account holder through incomplete, forged SDIRA documents.

49.     It is common industry knowledge and some of the Defendants have publicly acknowledged the fact that SDIRAs were being used by the likes of Taylor and Jennings to swindle investors.  Despite that fact, Defendants continued to market and affiliate with Fraud Promoters like Taylor and Jennings after such was widely known in the industry and that such fraud was escalating.

50.     Defendants have publicly acknowledged that although they claim to be "passive custodians," they have stopped "allowing customers to invest" in some SDIRA programs upon discovering issues with certain investment promoters.

51.     Upon information and belief, Defendants acted outside of their alleged  "passive custodian" capacity by:

a.  Jointly marketing their SDIRA custodial services with Fraud Promoters like Taylor and Jennings;

b.  Running background checks on investment promoters but failing and refusing to disclose the results of the background checks to their affected customers even if the Custodian determined that the investment scheme was a fraud; and

c.   Continuing to process new investments through SDIRAs with certain investment promoters like Taylor and Jennings even though the Custodian had actual knowledge that the investment promoter was perpetuating a fraudulent scheme.

52.     Taylor and Jennings could not have pulled off these multi-million dollar scams without Defendants' direct assistance and participation.

53.     Taylor and Jennings kept tight control over the direction of investments and creation of SDIRAs with Defendants.  Taylor and Jennings wanted to make sure they controlled the investment and that communications with investors such as Plaintiffs and the Class Members were consistent so that no suspicions were aroused.

SNYDER ♦ DORENFELD, LLP

54.     Defendants aided, facilitated and supported Taylor's and Jennings' control of the victims, so they could maintain a revenue stream comprised of hundreds of dollars per year per account from each victim for essentially doing nothing.

55.     In fact, Defendants knew that Taylor and Jennings were defaulting on loans and notes in the SDIRAs owned by Plaintiffs and the Class Members repeatedly over multiple years but turned a blind eye.  Defendants' failure to accurately report the value of the SDIRAs of Plaintiffs and the Class Members resulted in Plaintiffs and the Class Members being unaware that their investment monies had actually been stolen even though their SDIRAs appeared to be increasing in value.

56.     Although Defendants were "administering" the accounts of Plaintiffs and Class Members, the Defendants instead viewed and treated Taylor and Jennings as their partners and clients.  Thus, when the money ran out and the Ponzi schemes crumbled, Defendants refused to help Plaintiffs and the Class Members understand what happened to their investment money

57.     Defendants permitted Taylor and Jennings to provide the fair market value of the assets of the SDIRAs of their victims but once the fraudulent scheme was exposed Defendants required their customers to provide third party proof that the SDIRA was worthless and refused to modify the value of the SDIRA unless the victim/customer paid Defendants' administrative fees.

58.     Defendants gave Plaintiffs and the Class Members a false sense of security by making false and deceptive representations that made Plaintiffs and the Class Members believe that their "investments" were safe with "trust" companies and properly administered by Defendants. Plaintiffs and the Class Members, relying on those representations, tendered their hard-earned money to Defendants, while Defendants enabled Taylor and Jennings to steal the monies invested by Plaintiffs and the Class Members.  Many investors lost their entire life savings.

**Plaintiff Stanley Levine**

59.     Plaintiff Stanley Levine first became aware of a potential investment opportunity with Fraud Promoter Matthew Jennings in 2008 through a client of Levine's accountant who worked for Jennings.  Jennings was the principal of a group of companies known as "Westmoore."

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. C12-03959 WHA

10

60.     During a meeting with Levine, Jennings explained that Westmoore had several subsidiary companies that provided a diverse range of investment opportunities including property development, venture capital backing for high growth start-up companies desiring to go public, and business management companies.   Jennings told Levine that the Westmoore investors were receiving 17-18% return on investment.

61.     To make the investment, Levine transferred $150,000 from an IRA that Levine had with Charles Schwab into a SDIRA with Entrust Arizona.

62.     Entrust Arizona wired Levine's SDIRA monies into an account owned and controlled by Jennings in violation of Internal Revenue Code Section 4975.

63.     Levine learned about Entrust Arizona from Jennings.   Jennings had recommended Entrust Arizona to Levine and explained how Levine could invest in Westmoore by creating a SDIRA with Entrust Arizona.   Levine had a feeling that Jennings knew the people at Entrust Arizona personally.

64.     Levine thought that the documents he had to sign to open his Entrust SDIRA were long and complicated.   Levine did not understand them.   Levine also thought the SDIRA investment process was too complex and confusing, but Levine trusted Jennings so he signed the SDIRA documents to open an account with Entrust and made the investment with Westmoore.

65.     Jennings specifically assured Levine that Entrust Arizona "accepted" Jennings' investments for his other clients as a SDIRA custodian and "they will do the same for you.  You will have no problems with them."

66.     Based upon these assurances, Levine made his first investment of $150,000 with Jennings and his Westmoore entities through an Entrust SDIRA.

67.     Levine began receiving SDIRA account statements from Entrust Arizona in 2008. These account statements reflected Levine's Westmoore investment of $150,000 as simply a "Not Categorized" investment.   The statements he received included both the names "The Entrust Group" and "Entrust Arizona."

68.     Levine's SDIRA account statements from 2008 until 2011 never specified what assets Levine's SDIRA held pursuant to his first Westmoore investment.   In fact, each one of

SNYDER ♦ DORENFELD, LLP

Levine's SDIRA account statements from 2008-2011 reflected a SDIRA account value of $150,001.23.

69.     Levine's SDIRA account statement for calendar year 2009 stated that in May of 2009 Entrust Arizona and The Entrust Group, for the benefit of Levine's SDIRA and without Levine's knowledge or consent, had sold the Westmoore asset originally purchased from Westmoore Capital Group and purchased an asset from Westmoore Investment LP.  However, Levine's SDIRA statement did not reflect exactly what asset had been purchased on Levine's behalf or what Levine's SDIRA held as security for the investment, if anything.

70.     Levine's SDIRA statement for the first quarter of 2009 advised Levine that "in an effort to add an additional layer of security for our clients, we are changing how funds credited to your IRA are made payable."  But the statement directed Levine to visit The Entrust Group website www.theentrustgroup.com to access the information.

71.     In 2010, Entrust Arizona and The Entrust Group started sending out disclosures on its SDIRA account statements and letters to its customers, including Levine, explaining certain regulatory requirements applicable to the Custodian's ownership of SDIRA assets.   Levine received the disclosure on his SDIRA account statement for the second quarter of 2010 and received the letter in May of 2010.

72.     Entrust Arizona and The Entrust Group, by the second quarter of 2010, had known for several years that its SDIRAs were being utilized to perpetuate investment fraud on their customers.

73.     Instead of disclosing these facts to its customers and addressing the problem, Entrust Arizona and The Entrust Group chose to divert attention from their own responsibilities and instead advised Levine and its other clients in 2010, that regulators were becoming more stringent about the requirement that SDIRA assets must be held with the designated custodian as opposed to a mere nominee.

74.     In addition, Entrust Arizona and The Entrust Group indicated in their 2010 letter to Levine that regulators were now **requiring the custodians to ascertain fair market value of the**

SNYDER ♦ DORENFELD, LLP

1   SDIRA account and to review the "nature" of the assets that were not publicly traded assets

2   such as stock.

3       75.   **Entrust Arizona and The Entrust Group stated in this disclosure that they**

4   **were exploring changes to their business model and exploring business relationships to bring**

5   **them into compliance with these regulations**.  Entrust Arizona and The Entrust Group also

6   advised in their second quarter 2010 statement to Levine and their other customers that they were

7   raising their administrative fees.

8       76.   By their own admission, Entrust Arizona and The Entrust Group knew that they

9   were not in compliance with regulations requiring the custodian to provide a fair valuation of

10  SDIRA assets.  In fact, Entrust Arizona and The Entrust Group never provided a fair market

11  valuation of the assets held in Levine's SDIRA. Year after year, they provided Levine with SDIRA

12  account statements showing his investment was still worth $150,001.23.

13      77.   In late 2010 or early 2011, Levine found out that the SEC was investigating

14  Jennings and Westmoore and, in fact, the SEC had indicated that Jennings was running a Ponzi

15  scheme through Westmoore.  About this same time, Levine received a letter from Jennings

16  indicating that Levine would not be receiving any more investment interest payments from any of

17  his Westmoore investments.

18      78.   Thereafter, Levine received a letter advising him that the SEC was shutting down all

19  of the Westmoore entities and that the Westmoore entities were being forced into receivership.

20      79.   Levine attended a court hearing about the Westmoore receivership and the

21  distribution of Westmoore assets.  Levine inquired as to what he might receive from the

22  receivership but was told that it was unlikely Levine would receive anything from his Westmoore

23  investment.

24      80.   Subsequently, the SEC announced that Jennings had raised money from investors

25  through more than 15 offerings of debt and equity that were not registered with the SEC under

26  securities laws and that Jennings had operated a corporate shell game/Ponzi scheme through

27  Westmoore.

28

SNYDER ♦ DORENFELD, LLP

81.     After Westmoore's collapse, Levine wanted to close his SDIRA.   But Levine learned that Entrust Arizona and The Entrust Group wanted $750 to close Levine's SDIRA.

82.     Levine kept trying to get Entrust Arizona and The Entrust Group to reduce the value of his SDIRA to zero since the custodial fees were based on a percentage of the value of the SDIRA but an Entrust representative told Levine that he would have to get someone at Westmoore to provide a written third party SDIRA valuation form that Levine's SDIRA had zero value.  But Levine could not get anyone at Westmoore to complete the third party SDIRA valuation form for him.

83.     Then in late 2011, Levine received another letter from Entrust Arizona concerning the 2011 Fair Market Valuation of his SDIRA.  In this letter, Entrust Arizona advised Levine that: (a) First Trust Company of Onaga served as the Custodian for Levine's Entrust SDIRA; (b) that **First Trust as the SDIRA Custodian was "required to obtain the most current fair market value available for the investment(s) in the IRA at least once a year"; and (c) that the valuation should be performed by a "qualified, independent third party." Yet to this day, Entrust Arizona has *never* provided a fair market valuation of Levine's SDIRA by a qualified, independent third party as Entrust Arizona indicated it was required to do.**

84.     Enclosed with the Fair Market Valuation letter from Entrust Arizona was an "Annual Fair Market Valuation" form.  Levine could not get anyone at Westmoore to complete the valuation so Levine completed the form and submitted it to Entrust Arizona.

85.     In April of 2012, Levine received a letter from Entrust Arizona advising Levine that he owed $323.77 in outstanding fees and that Entrust Arizona was going to close his SDIRA if he did not pay the outstanding fees.

86.     Then in June of 2012, Levine received an IRS Form 5498 document from Entrust Arizona indicating that it had reported to the IRS that Levine's SDIRA was valued at $1.23. Levine had no idea why Entrust Arizona issued that statement or why his SDIRA value was suddenly reduced, especially since the last statements he had received indicated a value of over $150,000.

SNYDER ♦ DORENFELD, LLP

87.     To this day, Levine does not know what happened to his SDIRA assets.  In June of 2010, the SEC obtained an emergency court order freezing all assets controlled by Jennings and the Westmoore entities and confirmed that Jennings had been operating a $53 million Ponzi scheme through the Westmoore entities.

88.     Levine, as a senior, had certain needs and requirements related to his investments. Entrust Arizona and The Entrust Group marketed themselves to Mr. Levine and other seniors that: (a) they had experience with seniors and their special needs; (b) that they provided a safe and secure method of investment for seniors; and (c) that they could and would meet those special needs.

89.     Levine's SDIRA statements failed to accurately reflect the fair market value of his SDIRA assets.  Entrust Arizona and The Entrust Group also failed to disclose that Levine's SDIRA assets had been stolen by Jennings and become worthless.  Entrust Arizona and The Entrust Group also did not ascertain the actual value of the SDIRA assets owned by Levine and failed to report the actual value of their SDIRAs to the IRS as required by law.

**Plaintiffs Charles and Sandra Brissette**

90.     Plaintiffs Charles and Sandra Brissette first became aware of a potential investment opportunity with Fraud Promoter Ephren Taylor in 2005 when they received a flyer advertising an investment seminar Taylor had scheduled in the Los Angeles, California area.  Taylor was touting investment returns of 15%.

91.     Mr. and Mrs. Brissette eventually decided to invest with Taylor and were directed by Taylor and his staff to open a SDIRA with Entrust New Direction to invest in Taylor's ventures.

92.     Mr. Brissette invested $23,000 in Taylor's property investment ventures, while Mrs. Brissette invested $60,000 in the same property investment ventures.  Taylor allegedly owned and was developing the James A Reed Condo Development, the Jazz District Residential Home Development, and the Peregrine Falcon - City of KCKS: 400 Home Development properties.  As consideration for their investments, Mr. and Mrs. Brissette were to receive 15% interest on their investments.

SNYDER ♦ DORENFELD, LLP

93.    Entrust New Direction wired the Brissettes' SDIRA monies to a bank account owned and controlled by Taylor in violation of Internal Revenue Code Section 4975.

94.    Mr. and Mrs. Brissette each received a promissory note from Ephren Capital Corporation, one of the Taylor-controlled investment companies, in July of 2006 to secure their investments.

95.    However, Taylor started defaulting on the interest payments due on the Brissettes' promissory notes in early 2007.

96.    Mr. and Mrs. Brissette were never notified by Entrust New Direction or The Entrust Group that their promissory notes with Taylor were in default nor was it reflected on their SDIRA account statements.

97.    Mr. and Mrs. Brissette were also never notified by Entrust New Direction or The Entrust Group that the interest payments on their promissory notes were not being received from Taylor.

98.    A lawyer for Taylor, Donald Maxwell, contacted Mr. and Mrs. Brissette in 2008 and provided them with amended promissory notes and assurances that the amended promissory notes would be repaid.

99.    Taylor made two interest payments on the promissory notes in 2008 and has never made another payment to the Brissettes.

100.   Entrust New Direction and The Entrust Group also continued to bill Mr. and Mrs. Brissette year after year based upon the stated value of their SDIRA accounts even though Taylor had absconded with their investment monies in 2006.

101.   In 2010, Entrust New Direction and The Entrust Group started sending out disclosures on their SDIRA account statements concerning regulatory requirements applicable to the Custodian's ownership of SDIRA assets.  Mr. and Mrs. Brissette received such a statement from Entrust New Direction and The Entrust Group for the second quarter of 2010.

102.   Entrust New Direction and The Entrust Group, by the second quarter of 2010, had known for several years that its SDIRAs were being utilized by Fraud Promoters to perpetuate investment fraud on their customers.

SNYDER ◆ DORENFELD, LLP

103.    Instead of disclosing these facts to its customers and addressing the problem, Entrust New Direction and The Entrust Group chose to divert attention from their own responsibilities and instead advised Mr. and Mrs. Brissette, and their other clients, that regulators were becoming more stringent about the requirement that SDIRA assets must be held with the designated custodian as opposed to a mere nominee.

104.    In addition, Entrust New Direction and The Entrust Group indicated in a 2010 letter to the Brissettes that regulators were **now requiring the custodians to ascertain the fair market value of the SDIRA account and review the "nature" of the assets that were not publicly traded assets such as stock.**

105.    **Entrust New Direction and The Entrust Group stated in this disclosure that they were exploring changes to their business model and exploring business relationships to bring them into compliance with these regulations.**

106.    Entrust New Direction and The Entrust Group also advised in its second quarter 2010 statement to the Brissettes and their other customers that they were raising their administrative fees.

107.    To this day, Mr. and Mrs. Brissette have never found out what happened to their SDIRA assets.  Taylor is now a fugitive and has been accused by the SEC and other state securities regulators of running a multi-million dollar Ponzi scheme.

108.    Yet the Brissettes' SDIRA account statements year after year continued to reflect that their SDIRAs were valued at a little over $26,000 and $60,000 respectively and never indicated that the 2008 amended promissory notes given to them by Taylor had expired and that the prior 2006 promissory notes had been in default since 2007.

109.    By their own admission, Entrust New Direction and The Entrust Group knew that they were not in compliance with regulations requiring the Custodian to provide a fair valuation of SDIRA assets.  In fact, Entrust New Direction and The Entrust Group never provided a fair market valuation of the assets held in the Brissettes' SDIRAs. Year after year, Entrust New Direction and The Entrust Group provided the Brissettes with the same SDIRA account statements showing that the value of their respective SDIRAs had never changed.

110.    The Brissettes' SDIRA statements failed to accurately reflect the fair market value of their SDIRA assets.  Entrust New Direction and The Entrust Group also failed to disclose that their SDIRA assets had been stolen by Taylor and become worthless and that the purported security for their SDIRA assets was in default and no longer viable.  Entrust New Direction and The Entrust Group also did not ascertain the actual value of the SDIRA assets owned by the Brissettes and failed to report the actual value of their SDIRAs to the IRS as required by law.

## V.   CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action on their behalf and as a class action pursuant to Rules 23(a) and (b) (3) of the Federal Rules of Civil Procedure on behalf of a class (the "Taylor Class") defined as all persons or entities in California who invested in or held an investment through a SDIRA administered by Defendants from January 1, 2006 until the present (the "Class Period") and that was offered, sold or solicited by Ephren Taylor or any persons or entities associated with or related to him.

112.    Plaintiffs also bring this action on behalf of a class (the "Jennings Class") defined as all persons or entities in California who invested in or held an investment through a SDIRA administered by Defendants from January 1, 2006 until the present and that was offered, sold or solicited by Matthew Jennings or any persons or entities associated with or related to him.

113.    Plaintiffs also bring this action on behalf of a subclass (the "California Senior Subclass") defined as all California residents over 65 years of age who invested in or held an investment through a SDIRA administered by Defendants until the present that was offered, sold or solicited by Taylor or Jennings.

114.    Excluded from the Class are: (a) Defendants; (b) Members of the immediate family of each of the Defendants that are not corporate entities; (c) any person who was an executive officer, employee and/or director or their spouse, child or parent of any Defendant during the Class Period; (d) any person, firm, trust, corporation, officer, director or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; (e) any independent contractor of any Defendants who participated in the sale of the investment vehicles outlined herein; (f) the legal representatives, agents, affiliates, heirs, successors-in-interest

SNYDER ♦ DORENFELD, LLP

1    or assigns of any such excluded party; and (g) those persons who are named litigants or have opted

2    in to a class of persons in litigation against these Defendants for similar claims.

3        115.    The Class is so numerous that joinder of all Class Members is impracticable. While

4    the exact number of Class Members can only be determined by appropriate discovery, Plaintiffs

5    believe that the Class Members total over 1,000.

6        116.    Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs

7    and all Class Members sustained damages as a result of Defendants' unlawful course of conduct.

8        117.    Plaintiffs will fairly and adequately protect the interest of the Class Members and

9    have retained counsel competent and experienced in class action litigation. Plaintiffs have no

10   interests that are contrary to or in conflict with those of the Class Members that Plaintiffs seek to

11   represent.

12       118.    A class action is superior to other methods for the fair and efficient adjudication of

13   this controversy. The expense and burden of individual litigation make it virtually impossible for

14   the Class Members individually to seek redress for the wrongful conduct alleged herein.

15       119.    Common questions of law and fact exist as to all Class Members and predominate

16   over any questions solely affecting individual Class Members. Among the questions of law and

17   fact common to the Class are:

18       a.    Whether Defendants made false and misleading representations to Plaintiffs

19             and the Class;

20       b.    Whether Defendants engaged in false, misleading and deceptive advertising;

21       c.    Whether Defendants engaged in financial elder abuse of Plaintiff Stan

22             Levine and the California Senior Subclass Members;

23       d.    Whether Defendants have violated California's Unfair Competition Law;

24       e.    Whether Defendants' acts constitute violations of the Dodd-Frank Wall

25             Street Reform and Consumer Protection Act; *See, e.g.,* 15 U.S.C. § 78u, *et*

26             *seq.*;

27

28

SNYDER ♦ DORENFELD, LLP

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. C12-03959 WHA

19

f.      Whether Plaintiffs and the Class Members have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

120.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

121.    The names and addresses of Class Members are obtainable from information in the possession of Defendants and/or their agents.  Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

**COUNT I**

**<u>CONVERSION</u>**

(Against All Defendants)

122.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs of this Complaint as if restated and fully set forth herein.

123.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings Classes.

124.    As described more fully above, the "investment" programs concocted by Taylor and Jennings that Plaintiffs and the Class Members invested in were bogus.  Defendants aided and abetted Ponzi schemes and other fraudulent conduct that permitted Taylor and Jennings to exercise unauthorized dominion and control over the property of Plaintiffs and the Class Members.

125.    Defendants' conversion has permanently deprived Plaintiffs and the other Class Members of their property, causing damage.

126.    Plaintiffs and the Class Members have repeatedly demanded that their funds be returned but Defendants did not in fact return them.

127.    Defendants' actions have directly caused injury and damages to Plaintiffs and the Class Members.

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

**COUNT II**

**INTENTIONAL FRAUD**

(Against All Defendants)

128.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

129.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings Classes.

130.    Defendants made several misrepresentations to the public at large and to Plaintiffs and the Class Members as set forth above.  In particular, Defendants sent account statements to Plaintiffs and the Class Members stating that the SDIRA accounts had significant value when in fact the money had been stolen.

131.    Defendants knew that these statements were false when they made them.

132.    Defendants intended for Plaintiffs and the Class Members to rely upon their false statements.

133.    Plaintiffs and the Class Members did rely on Defendants' false statements, and would never have invested in and continued to invest in SDIRAs were it not for the false statements.

134.    Defendants have enjoyed substantial financial gain, and Plaintiffs and the Class Members have suffered severe financial loss, as a result of these false statements.

**COUNT III**

**VIOLATION OF CALIFORNIA'S ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT (Welfare and Institutions Code § 15600, *et seq.*)**

(Against All Defendants)

135.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

136.    This cause of action is asserted on behalf of Plaintiff Levine and the California Senior Subclass.

137.    Under California's Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code § 15600, *et seq.*, unscrupulous professionals or businesspersons, or persons posing as such may not financially exploit a senior (65 years of age or older) on the basis of their age, health or mental condition by overcharging for services or products and using deceptive or unfair business practices.

138.    Defendants wrongfully took the monies and properties of Plaintiff Levine and the California Senior Subclass Members, who are 65 years of age or older, and intended to defraud them and unlawfully obtain possession of their retirement funds.

139.    Defendants wrongfully took the property of Plaintiff Levine and the California Senior Subclass Members.

140.    As a result of Defendants' wrongful conduct, Plaintiff Levine and the California Senior Subclass Members incurred economic harm and losses.

141.    As a direct and proximate result of this wrongful conduct, Plaintiff Levine and the California Senior Subclass Members sustained injuries.

**COUNT IV**

**<u>UNFAIR COMPETITION</u>**

**(Business and Professions Code § 17200 *et seq.*)**

(Against all Defendants)

142.    Plaintiffs incorporate the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

143.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings Classes.

144.    Business and Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

145.    This private Attorney General action is brought by Plaintiffs Charles and Sandra Brissette to remedy violations of California's state consumer protection statutes arising out of

SNYDER ♦ DORENFELD, LLP

Defendants' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

146.    Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of Business and Professions Code § 17200 *et seq.*

147.    This is a private Attorney General action brought on behalf of the general public. As detailed herein, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations.

148.    Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving "investments" in illegal gambling activities, shell companies and ghost investment vehicles constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's Unfair Competition Law.

149.    Defendants' conduct is of a continuing nature that requires prompt relief. Defendants have uniformly represented to the general public through their representatives that their actions were legally appropriate when in fact they were not and/or have concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary to make their other representations not misleading for want of disclosure of such omitted facts or because they possess superior knowledge of the true facts.

150.    Plaintiffs and the Class Members have suffered, and continue to suffer, actual injury in fact due to Defendants' willful actions that are contrary to the public policy of California, are substantially injurious to consumers of California and constitute unfair trade practices and competition under Business & Professions Code § 17200, *et seq.*

151.    Based upon the obligations imposed upon Defendants and their experience in the industry, Defendants either knew, recklessly disregarded, reasonably should have known or were obligated under the law to provide correct and prompt information on the status of Plaintiffs' SDIRAS and to notify Plaintiffs if said SDIRAS were in default.  Defendants failed to do so.  As a result, Plaintiffs and the Class Members were subjected to unlawful, unfair and/or fraudulent

SNYDER ♦ DORENFELD, LLP

treatment and Defendants were unjustly enriched and should be ordered to pay restitution pursuant to Business and Professions Code §§ 17203 and 17204.

152.   Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts, having the status of their SDIRA wrongfully misrepresented, and/or the associated financial information as to the value of their investment being falsely reported.

153.   Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.   Pursuant to Business and Professions Code § 17203, Plaintiffs are entitled to preliminary and permanent injunctive relief requiring Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

154.   Plaintiffs and the Class Members seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs and the Class Members all monies owed them as alleged in this Complaint.

155.   Plaintiffs and the Class Members additionally request an order from this Court requiring that Defendants make restitution of profits and return or pay to Plaintiffs and the Class Members all of Defendants' ill-gotten gains obtained from the illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

156.   The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public.  Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

157.   Pursuant to Business & Professions Code § 17203, Plaintiffs, on behalf of the Class and the general public, seek a temporary, preliminary and/or permanent order from this Court prohibiting Defendants from continuing to engage in the unlawful, unfair, or fraudulent business

SNYDER ♦ DORENFELD, LLP

acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Defendants or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Defendants and/or their representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

158.    Plaintiffs and the Class Members further request a court order that an asset freeze or constructive trust be imposed over all monies in the Defendants' possession that rightfully belong to Plaintiffs and the Class Members.

159.    Plaintiffs request judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, treble damages and attorney's fees together with court costs.

**COUNT V**

**VIOLATION OF THE CONSUMER FINANCIAL PROTECTION BUREAU'S**

**REGULATIONS**

**(15 U.S.C. § 78u, *et seq.*)**

(Against All Defendants)

160.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

161.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings Classes.

162.    Financial entities that engage in conduct that poses a risk to consumers as well as financial entities that engage in unfair, deceptive or abusive acts or practices are regulated by and subject to enforcement actions from the Consumer Financial Protection Bureau ("CFPB"), which was created by the Dodd-Frank Act, 15 U.S.C. § 78u, *et seq.*

163.    Defendants herein materially interfered with their customers' ability to understand a term or condition of a consumer financial product or service; took unreasonable advantage of their

SNYDER ♦ DORENFELD, LLP

1  customers' lack of financial savvy; and precluded the customers' ability to protect themselves in

2  the selection or use of consumer financial products or services.

3       164.    Defendants' conduct constitutes unfair, deceptive and misleading practices by

4  financial service firms within the meaning of the CFPB Rules.

5       165.    Plaintiffs and the Class Members have suffered damages as a proximate result of the

6  Defendants' violation of the CFPB rules.

7  **COUNT VI**

8  **<u>NEGLIGENT MISREPRESENTATION</u>**

9  (Against All Defendants)

10       166.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if

11  restated and fully set forth herein.

12       167.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings

13  Classes.

14       168.    Defendants made several misrepresentations to the public at large and to Plaintiffs

15  and the Class Members as set forth above.  In particular, Defendants sent account statements to

16  Plaintiffs and the Class Members stating that the SDIRA accounts had significant value when in

17  fact the money had been stolen.

18       169.    Defendants should have known that these statements were false when they made

19  them.

20       170.    Defendants intended for Plaintiffs and the Class Members to rely upon their false

21  statements.

22       171.    Plaintiffs and the Class Members did rely on Defendants' false statements and

23  would never have invested through SDIRAs with Defendants were it not for the false statements.

24       172.    Defendants have enjoyed substantial financial gain, and Plaintiffs and the Class

25  Members have suffered severe financial loss as a result of their reliance on Defendants' false

26  statements.

27

28

SNYDER ♦ DORENFELD, LLP

## COUNT VII

## **CONSTRUCTIVE TRUST**

(Against All Defendants)

173.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

174.    Plaintiffs bring this claim on behalf of themselves and the Taylor and Jennings Classes.

175.    As a proximate result of Defendants' fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiffs have sustained damages.

176.    By reason of the fraudulent and otherwise wrongful manner in which Defendants obtained their alleged right, claim or interest in and to the property, Defendants, each of them, have no legal or equitable right, claim or interest therein.

177.    Instead, Defendants, and each of them, are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs and the Class Members with the duty to convey the same to Plaintiffs and the Class Members forthwith.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, demand upon Defendants jointly and severally for:

1.    An Order certifying the case as a class action;

2.    An Order appointing Plaintiffs as the Class Representatives of the Class and Plaintiff Levine as the Class Representative of the California Senior Subclass;

3.    An Order appointing undersigned counsel and their firms as counsel for the Class;

4.    As to Counts I and II, compensatory damages, punitive damages, and attorney's fees and costs pursuant to the private Attorney General statutes;

5.    As to Count III, compensatory damages, punitive damages, statutory penalties, and attorney's fees and costs under statute and private Attorney General statutes;

6.    As to Count IV, restitution, disgorgement of profits, injunctive relief, and attorney's fees and costs under statute and private Attorney General statutes;

SNYDER ♦ DORENFELD, LLP

7.     As to Count V, disgorgement of profits, statutory penalties, injunctive relief, and attorney's fees and costs under statute and private Attorney General statutes;

8.     As to Count VI, compensatory damages and attorney's fees and costs pursuant to the private Attorney General statutes;

9.     As to Count VII, an order that a constructive trust be imposed over all monies in Defendants' possession that rightfully belong to Plaintiffs and/or an asset freeze of monies belonging to Defendants, and attorney's fees and costs under private Attorney General statutes;

10.    As to all counts, pre and post-judgment interest as allowed by law;

11.    As to all counts, an award of taxable costs; and

12.    As to all counts, any and all such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

Respectfully Submitted:

Dated:  January 3, 2013                    SNYDER ♦ DORENFELD, LLP

By: ____/s/ David K. Dorenfeld_____

David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:   (818) 865-4010
Email: davidd@sd4law.com
          mwb@sd4law.com

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile: (954) 341-3568
Email: clerman@lermanfirm.com

BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

Attorneys for Plaintiffs